IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RESIDENTIAL WARRANTY SERVICES, INC., <br><br> Plaintiff, <br><br> v. <br><br> GOYO MEDIA, LLC; CLEAR SATELLITE, INC.; CLEAR HOME, INC.; JOHN HARD; PAUL SOUTHAM; and CASEY HREINSON, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:20-cv-00898-TC-DAO <br><br> District Judge Tena Campbell <br> Magistrate Judge Daphne A. Oberg |

In this contract case, Plaintiff Residential Warranty Services, Inc. (RWS) moves for partial summary judgment on three of the five claims in its second amended complaint.[1] (ECF No. 43.)[2] The motion has been fully briefed, and the court heard oral argument via Zoom on August 3, 2022. (ECF No. 58.) For the following reasons, the court DENIES RWS's motion.

## BACKGROUND

RWS provides home inspections and home warranties to prospective homebuyers. Some of those homebuyers have authorized RWS to give their contact information to third parties, who then offer those buyers deals on bundled television, internet, and alarm monitoring services. Defendant Goyo Media, LLC, owned by Defendants Paul Southam and Casey Hreinson, was one of those third-party companies. Mr. Southam and Mr. Hreinson also own two other companies: Defendants Clear Satellite, Inc., and Clear Home, Inc. (together, the "Clear Entities"). Clear

---

[1] After filing its motion, RWS dismissed its claims against Defendant John Hard. (ECF No. 53.) Mr. Hard was not named in this motion. (See Mot. Partial Summ. J. (MPSJ) at 2 n.1, ECF No. 45.)

[2] RWS filed redacted and unredacted versions of its motion. (ECF Nos. 43 & 45.) The unredacted version was initially filed under seal, though it has since been unsealed. (ECF No. 49.) The court will primarily cite to the unredacted version—ECF No. 45—in this order.

Satellite, incorporated in 2009, exclusively sold DirecTV services. Clear Home took over Clear Satellite's DirecTV contract in 2017, though it has since shifted to a different line of business.

Jesse Christiansen was Goyo's acting president from 2014 to 2015 (or 2016), and he later became the chief revenue officer of Clear Home. (Opp'n to MPSJ Ex. 2 (Christiansen Dep.) 13:8–17, 14:2–23, ECF No. 50-3.) Jeremy Assmus was a Goyo manager from 2017 to 2018, after which he also joined Clear Home as vice president of sales. (MPSJ Ex. 1 (Southam 30(b)(6) Dep. #1) 66:18–22, ECF No. 45-2; Opp'n Ex. 3 (Assmus Dep.) 32:24–33:6, ECF No. 50-4.) Mr. Christiansen and Mr. Assmus ran Goyo's day-to-day operations, (Opp'n Ex. 7 (Southam Individual Dep.) 15:1–10, ECF No. 50-8), while Mr. Southam set Goyo's overall business objectives and policies. (Southam 30(b)(6) Dep. #1 21:15–18, ECF No. 45-2.) Though Mr. Hreinson had an ownership stake in Goyo, he held no responsibilities and was a self-described "silent partner." (MPSJ Ex. 4 (Hreinson Dep.) 16:25–17:8, ECF No. 45-5.)

RWS and Goyo signed a Service and Marketing Agreement in 2015, under which RWS would provide Goyo with customer leads in exchange for a series of fees and commissions. (MPSJ Ex. 8, ECF No. 45-9.) Those fees initially included a 15% sales percentage, a $17 per-lead fee, and a $10,000 monthly marketing fee. (Id. at 7.) The Agreement could only be amended, or any provision waived, "by [a] written agreement[] signed by both Parties and demonstrably understood by its term to be an amendment or waiver of this Agreement." (Id. § 11.1.) Under the Agreement, Goyo sold bundled services as part of a "Concierge Program" that the parties designed. The Program included a website domain (www.fullconcierge.com)[3] and two toll-free phone numbers that customers could call. (Christiansen Dep. 49:22–51:4, ECF No. 50-3.)

---

[3] In marketing the Concierge Program, RWS apparently rebranded Goyo as "Full Concierge." (Southam 30(b)(6) Dep. #1 96:3–9, ECF No. 45-2.) In other words, "Full Concierge" was Goyo's "front-facing company name." (Assmus Dep. 74:6–10, ECF No. 50-4.)

Goyo began having trouble contacting all its leads soon after signing the Agreement. (Assmus Dep. 65:13–67:10, ECF No. 50-4.) The high per-lead fee also hurt Goyo's profitability. (Christiansen Dep. 21:16–20, 38:24–39:9, ECF No. 45-7.) Accordingly, the parties reduced the per-lead fee from $17 to $7. (Assmus Dep. 58:16–60:25, ECF No. 50-4; Southam Individual Dep. 19:2–31:25, ECF No. 50-8.)[4] This per-lead fee later morphed into a revenue-sharing arrangement, whereby Goyo paid RWS a portion of each Concierge Program sale. (Assmus Dep. 59:10–60:3, 61:16–62:20, 86:6–88:5, ECF No. 50-4; Southam Individual Dep. 20:1–22:11, 47:24–50:9, 54:14–55:14, ECF No. 50-8; Christiansen Dep. 52:3–25, ECF No. 50-3; see Opp'n Ex. 9, ECF No. 50-10.) These changes were typically informal and conducted over email or telephone. RWS billed Goyo for the leads and for its services by sending Goyo monthly invoices. (E.g., MPSJ Ex. 10, ECF No. 45-11.) But these invoices were automatically generated and did not always reflect the parties' modified fee structure. (Thornberry Dep. 194:10–17, ECF No. 50-7; Assmus Dep. 70:8–21, ECF No. 50-4.) As a result, Mr. Christiansen would arrange to pay RWS according to the parties' modified agreement, not the amount printed on the invoice. (See Christiansen Dep. 43:20–45:10, ECC No. 45-7.)

As a startup company, Goyo's financial situation was usually unsteady and often precarious. (See Opp'n Ex. 1 (Southam 30(b)(6) Dep #1) 98:23–99:1, ECF No. 50-2.) While this case was pending, RWS's expert forensic accountant, Jeremy McGannon, examined bank accounts and financial documents belonging to Goyo and the Clear Entities. (MPSJ Ex. 11 (McGannon Report) at 4, ECF No. 45-12.) He first observed that Goyo was financially dependent on the Clear Entities, as over 90% of its total inflows between 2015 and 2018 came from the Clear Entities. He

---

[4] RWS President Nathan Thornberry testified that the purported $17-to-$7 change was not an amendment to the Agreement, but rather a "valiant attempt . . . to help Paul [Southam] out" by not billing Goyo for the full $17 when the potential customer only expressed interest in alarm services, not the bundled services Goyo offered. (Opp'n Ex. 6 (Thornberry Dep.) 197:9–201:5, ECF No. 50-7.) At a minimum, this fact is disputed.

also noted that Goyo was undercapitalized, as its liabilities exceeded its assets every year between 2015 and 2018, and its financial ratios were below comparable industry benchmarks. And he confirmed other potential indicia of alter-ego status, like similar ownership structures.

Goyo tried to negotiate an Amendment to the Agreement in early 2018. Under the Amendment, Goyo would pay RWS $29,113 and transfer ownership of its website and toll-free phone numbers in exchange for a release from the Agreement and a new contract between RWS and Clear Home. (Southam 30(b)(6) Dep. #1 80:23–81:21, 89:2–17, 90:18–91:3, ECF No. 45-2.) The Amendment was never signed, but at some point Goyo transferred its website and phone numbers to RWS. Yet RWS refused to accept the $29,113 check. (Id. 82:4–84:23.)

In July 2018, RWS demanded that Goyo pay eighteen allegedly unpaid invoices totaling $582,960.16, and it offered a $50,000 discount on the bill if Goyo gave RWS the Full Concierge website. (MPSJ Ex. 9, ECF No. 45-10.) Mr. Southam reported being "surprised" at seeing this offer, as he claimed that Goyo transferred its website between April and May 2018—before receiving the demand letter. (Southam 30(b)(6) Dep. #1 50:13–25, ECF No. 45-2.) Goyo ceased operating in October 2018 and transferred its remaining assets to the Clear Entities. (Id. 118:4–119:16; MPSJ Ex. 16, ECF No. 45-17.) Litigation ensued.

**LEGAL STANDARD**

In general, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could affect the outcome of the lawsuit." Arlin Geophysical Co. v. United States, 946 F.3d 1234, 1237 (10th Cir. 2020) (quoting Cillo v. City of Greenwood Vill., 739 F.3d 451, 461 (10th Cir. 2013)). "A factual dispute

4

is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." Id. (quoting Cillo, 739 F.3d at 461).

The movant must first show the "absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." Talley v. Time, Inc., 923 F.3d 878, 893–94 (10th Cir. 2019) (quoting Teets v. Great-W. Life & Annuity Ins. Co., 921 F.3d 1200, 1211 (10th Cir. 2019)). But the court must always view the facts and draw all reasonable inferences in favor of the nonmovant. Hall v. Allstate Fire & Cas. Ins. Co., 20 F.4th 1319, 1323 (10th Cir. 2021) (citing Cillo, 739 F.3d at 461).

## ANALYSIS

RWS moves for summary judgment on three of its claims: breach of contract, account stated, and alter ego. The court will discuss each in turn.

### I.  Breach-of-Contract Claim

RWS's first claim is for breach of contract. In Utah, there are four elements to a breach of contract: (1) the existence of a valid and enforceable contract, (2) the plaintiff having performed its contractual obligations, (3) the defendant having breached the contract, and (4) the plaintiff having suffered damages. See Bair v. Axiom Design LLC, 2001 UT 20, ¶ 14, 20 P.3d 388, 392. RWS maintains that Goyo's failure to pay the full invoiced amount is a breach of the Agreement. In response, the Defendants raise the affirmative defense of accord and satisfaction, claiming that even though the 2018 Amendment was never signed, the website and phone transfers functioned as an accord. (Ans. to Second Am. Compl. at 13, ECF No. 39.)

An accord is a "contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original

5

duty." Restatement (Second) of Contracts § 281(1) (1981). This defense has three elements: "(1) an unliquidated claim or a bona fide dispute over the amount due; (2) a payment offered as full settlement of the entire dispute; and (3) an acceptance of the payment as full settlement of the dispute." Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1013 (10th Cir. 2002) (quoting ProMax Dev. Corp. v. Raile, 2000 UT 4, ¶ 20, 998 P.2d 254, 259). To prevail on summary judgment, RWS must show the absence of a genuine dispute of material fact on this defense. See Britvic Soft Drinks Ltd. v. ACSIS Techs., Inc., 265 F. Supp. 2d 1179, 1185 (D. Kan. 2003).

RWS has not met this burden, as the Defendants have put material facts genuinely in dispute. To try and settle the invoices that were piling up, Goyo offered RWS control of its Concierge Program telephone numbers and website, along with a $29,113 check. This was part of the April 2018 Amendment that the parties negotiated but never consummated. That July, RWS sent a demand letter to the Defendants, insisting on Goyo's full payment of the invoices. RWS's letter offered a $50,000 discount on the amount due if Goyo transferred its website, but Paul Southam testified that Goyo had already transferred its website when it received the demand letter. (Southam Dep. #1 50:13–25, ECF No. 45-2.)

When "a [payment] is tendered under the condition that [acceptance] will constitute full settlement, mere [acceptance] of the [payment] constitutes [an] accord, regardless of the payee's efforts or intent to negate the condition." Est. Landscape & Snow Removal Specialists, Inc. v. Mountain States Tel. & Tel. Co., 844 P.2d 322, 330 (Utah 1992). In other words, if Goyo offered RWS a check, the website, and the phone numbers as a full settlement of the disputed invoices, RWS's acceptance of the website and phone numbers can be considered an accord, even if RWS had the subjective intent to accept the website and phone numbers for a different reason, like to ensure continuity of service. "[A]ccord and satisfaction 'does not necessarily involve mental

6

assent.'" Valley Asphalt, Inc. v. Stimpel Wiebelhaus Assocs., 3 F. App'x 838, 840 (10th Cir. 2001) (quoting Hoeppner Constr. Co. v. United States, 273 F.2d 835, 837 (10th Cir. 1960)).

When a party offers an accord, a creditor cannot both accept partial payment and reserve the right to sue for full payment. See Marton Remodeling v. Jensen, 706 P.2d 607, 609–10 (Utah 1985). RWS may have refused to negotiate the check, but its acceptance of the website and the phone number—part of Goyo's proposed accord—certainly seems like RWS's attempt to extract a partial payment. RWS would have had to reject Goyo's entire offer if it wanted to later sue for the full amount it claims was due. Given the dispute over the timing and the effect of the website and phone-number transfer, a reasonable jury could find that the transfer acted as an accord and satisfaction, relieving the Defendants of any liability for breach of contract.[5] The court DENIES summary judgment on this claim.

## II. Account-Stated Claim

RWS's second claim is for account stated, which is an agreement that a specific amount is owed for a prior transaction. See Hurd v. Cent. Utah Water Co., 106 P.2d 775, 777–78 (Utah 1940). It can be viewed as a new contract about the amount owed on a prior contract, so it is simply a different way of framing a breach-of-contract claim. Dale K. Barker Co., P.C. v. Valley Plaza, 541 F. App'x 810, 814 (10th Cir. 2013). This claim has three elements: (1) "a transaction between the parties giving rise to a debt," (2) "an agreement between the parties on the amount of the debt," and (3) "an express or implied promise by the debtor to pay the amount owed." Mrs. Fields Franchising, LLC v. MFGPC, 721 F. App'x 755, 761 (10th Cir. 2018) (citing DeMentas v. Est. of Tallas ex rel. First Sec. Bank, 764 P.2d 628, 634 (Utah Ct. App. 1988)). RWS asserts that by failing

---

[5] The record is also full of material factual disputes about exactly how much money Goyo owed RWS under the Agreement, as the parties purported to change various fees throughout their relationship.

to object to each invoice, Goyo impliedly agreed to pay the full amount listed on each invoice. The Defendants argue that RWS's evidence fails to satisfy the second and third elements. In their view, though under the Agreement Goyo owed RWS some amount of debt, there was never an agreement on the amount of the debt, nor was there an implied promise to pay that agreed-upon amount.

The court agrees with the Defendants and concludes that RWS has not met its burden on this claim.[6] As with the breach-of-contract claim, there are disputed material facts about whether the invoiced amounts were correct and whether the Agreement was terminated by an accord and satisfaction. The court DENIES summary judgment on this claim.

### III. Alter-Ego Claim

RWS's final claim asks the court to pierce Goyo's corporate veil and hold the rest of the Defendants liable for Goyo's actions. Technically, an alter ego claim is a theory of liability, not an independent claim for relief. Jones & Trevor Mktg., Inc. v. Lowry, 2012 UT 39, ¶ 6 n.1, 284 P.3d 630, 634 n.1. "[C]ourts must examine the entire relationship between a corporation and its officers and determine whether there are any genuine issues of material fact regarding the party's alter ego theory that would prevent summary judgment." Id. ¶ 3, 284 P.3d at 633.

RWS's expert forensic accountant, Jeremy McGannon, prepared a report that focuses on alter-ego issues. (McGannon Report, ECF No. 45-12.) The Defendants' opposition memorandum does not even mention Mr. McGannon's report, and they fail to otherwise rebut his report or offer a rebuttal expert of their own. Even so, the court will not enter summary judgment on the alter-

---

[6] RWS cites two out-of-circuit cases and the Restatement of Contracts, which say that an account stated may exist when a party receives an invoice and fails to object within a reasonable time. But RWS's invoices were not always accurate, and this black-letter principle does not appreciate the flexible and nuanced relationship between RWS and Goyo. (See Thornberry Dep. 194:10–17, ECF No. 50-7; Assmus Dep. 70:8–21, ECF No. 50-4; Christiansen Dep. 43:20–45:10, ECC No. 45-7.) Given the parties' informal relationship, it may have been unnecessary for Goyo to object to each invoice. The court rejects this formalistic argument.

ego claim because there are material facts in dispute on the other two claims. It would ultimately be premature to enter summary judgment on alter-ego liability without a corresponding substantive claim. The court DENIES summary judgment on this claim.

## **CONCLUSION**

A rational jury could find in the Defendants' favor on all three claims, which means there are genuine disputes of material fact here. Accordingly, **IT IS ORDERED** that RWS's motion for partial summary judgment (ECF No. 43) is DENIED.

DATED this 18th day of August, 2022.

BY THE COURT:

TENA CAMPBELL
United States District Judge