IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RESIDENTIAL WARRANTY SERVICES, INC., an Indiana corporation,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>GOYO MEDIA, LLC, a Utah limited liability company; CLEAR SATELLITE, INC., a Utah corporation; CLEAR HOME, INC., a Utah corporation; PAUL SOUTHAM, an individual; and CASEY HREINSON, an individual,<br><br>　　　　　Defendants. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br><br>Case No. 2:20-cv-00898-TC<br><br>Judge Tena Campbell |

The court heard the above-captioned matter in a two-day bench trial that commenced on March 13, 2023. Based on the record made at trial, the court now issues its findings of fact and conclusions of law.

## BACKGROUND

In this action, Plaintiff Residential Warranty Services, Inc. (RWS) sues Defendants Goyo Media, LLC (Goyo); Clear Satellite, Inc. (Clear Satellite); Clear Home, Inc. (Clear Home); Paul Southam; and Casey Hreinson. The dispute centers around a business relationship between RWS and Goyo that the parties agree was never profitable. After multiple attempts to modify the contract governing that relationship, the parties terminated their business dealings with each other.

RWS asserts that Goyo breached the parties' contract and the implied covenant of good faith and fair dealing, and that Goyo owes RWS certain outstanding invoice amounts under a

1

claim for account stated.  RWS also brings an alter ego claim against Clear Satellite, Clear Home, Mr. Southam, and Mr. Hreinson, claiming that these Defendants failed to maintain appropriate corporate formalities and that therefore they are liable for any amounts that Goyo owes to RWS.

The Defendants assert the affirmative defense of accord and satisfaction.  They argue that the parties reached an oral agreement during their negotiations to resolve any outstanding debts to RWS and that, having performed their part of that bargain, the Defendants are not liable to RWS under any of the claims brought in this lawsuit.  Assuming the court does find liability against them, the Defendants argue that Goyo maintained a separate corporate identity, and that therefore the court cannot find the other Defendants were alter egos of Goyo.

The court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

## FINDINGS OF FACT

### I.   The Parties

#### A.  Residential Warranty Services

RWS is a nationwide service contract company that sells products and services to real estate brokers, home inspectors, and homeowners.  (Uncontroverted Fact 1, ECF No. 71-1; Tr. 21–22 (P. Nathan Thornberry), ECF Nos. 83 & 85.)  P. Nathan Thornberry, RWS's president, CEO, and also an owner of RWS, testified about the customized leads program that is relevant to this lawsuit.  (Uncontroverted Fact 3; Tr. 21, 29–33 (Thornberry).)

RWS offers a variety of home warranties, including warranties for new homes and for appliances in old homes.  (Tr. 22–23 (Thornberry).)  In 2001, the company introduced a short introductory version of a home warranty—essentially, a 90-day trial.  (Tr. 23 (Thornberry).)

RWS distributed this trial version through home inspectors, who could tell prospective clients that their home inspection included a 90-day home warranty.  (Id.)  RWS charged home inspectors a fee for this product: "[W]e went to inspection companies … [and] said here's this 90-day version of a warranty and here is a price for that.  So you have to pay us, you know, $20, $30, for this product.  And inspection companies would sign up without hesitation."  (Tr. 30 (Thornberry).)

As RWS began selling more of these products, it developed ways to reduce the cost for home inspectors—namely, by developing a customized leads program.  (Tr. 31 (Thornberry).)  Mr. Thornberry described the program as follows: "[L]et's say [certain home inspectors] were a $20 program.  They could reduce that expense by, you know, $13 … up to $15, by signing up for a lead program … whereby the homebuyer would, in the process of the home inspection, sign off on receiving solicitations, including phone calls from our partners …."  (Id.)  In other words, home inspectors could purchase and provide the 90-day home warranty more cheaply if the homebuyer agreed to receive marketing calls from other companies selling services like cable TV, satellite TV, internet, and alarm systems.  (Tr. 32–34 (Thornberry).)  Inspection companies would pay RWS for the warranties either "by check, by credit card, or in part by these leads."  (Tr. 31 (Thornberry).)

From RWS's perspective, the cost of the lead program was "whatever the discount was off of the program for the home inspection participant."  (Tr. 32 (Thornberry).)  If the home inspector received a discount of $15, for instance, RWS would make up that difference by selling the lead to a third-party "partner."  (Tr. 33 (Thornberry).)  That third party would then have a "limited window in which to get the full value" (i.e., a sale for television, internet, or other services) from the client, because new homeowners generally enroll in services within "a couple

of weeks" and the lead would be useless after that time.  (Tr. 32–33 (Thornberry).)

While RWS worked with several different service providers, the company recognized that there was "a potential for an overwhelming kind of sales call" if one company could call new homeowners and offer them the variety of services they might need.  (Tr. 34–35 (Thornberry).)  To that end, RWS was interested in providing new homeowners not just with deals on television and internet, but also with a database of information about how to set up utilities and anything else a homeowner might need immediately after purchasing a home.  (Id.) To deliver this one-stop program for its clients, RWS teamed up with Goyo.

### B.  Goyo

When it was operational, Goyo was a Utah limited liability company that was formed in 2011.  (Tr. 177 (Casey Hreinson), 220 (Paul Southam); Goyo Articles of Organization, Ex. 2.[1])  Goyo provided TV, internet, phone, and security services; it also specialized in bundling those services.  (Uncontroverted Fact 4.)  Before partnering with RWS, Goyo developed a website with the URL www.fullconcierge.com (the Full Concierge website) to help new homeowners choose and set up services and utilities.  (Tr. 324–25 (Southam).)  Goyo also owned certain toll-free telephone numbers that potential customers used to contact the Full Concierge program.  (Tr. 335 (Southam).)

At the relevant time of this lawsuit—from 2015, when Goyo entered into an agreement with RWS, until 2018, when Goyo dissolved—, Goyo was owned by Paul Southam and Casey Hreinson, who both testified at trial.  (Uncontroverted Facts 5, 8–9.)  Mr. Southam was Goyo's president and set overall business objectives and policies for the company.  (Tr. 190–91 (Southam).)  Mr. Hreinson was a silent partner who received updates from Mr. Southam about

---

[1] Unless otherwise specified, all exhibit references refer to the exhibits introduced at trial.

Goyo's business dealings.  (Tr. 155 (Hreinson).)  Goyo's day-to-day management was run by other employees, including two individuals who testified at trial: Jesse Christiansen was Goyo's acting president from 2014 until sometime in 2015 or 2016, while Jeremy Assmus was a Goyo manager from 2017 to 2018.  (Uncontroverted Facts 6–7.)  Mr. Southam and Mr. Hreinson each owned 50% of Goyo when it dissolved in 2018.  (Uncontroverted Fact 9.)

### C.  The Clear Entities

Mr. Southam and Mr. Hreinson were also equal owners of another company: Clear Satellite.[2]  (Uncontroverted Fact 17.)  Clear Satellite was a provider of TV services that was founded in 2009.  (Uncontroverted Fact 10.)  Mr. Southam was the CEO of Clear Satellite and Mr. Hreinson was its president.  (Uncontroverted Fact 16.)  The company had an exclusive contract to sell DirecTV services—meaning that Clear Satellite agreed not to sell other satellite TV services—and was the largest DirecTV dealer in the nation at one time.  (Uncontroverted Fact 11.)  Due to the large volume of sales, Clear Satellite received preferential payment terms from DirecTV.  (Uncontroverted Fact 12.)  Mr. Southam and Mr. Hreinson created Goyo so that they could make deals with other satellite providers while maintaining Clear Satellite's exclusive contract with DirecTV.  (Uncontroverted Fact 13.)

Mr. Southam and Mr. Hreinson formed another entity, Clear Home, in 2017 after a merger between Clear Satellite and Now Communications, a competitor.  (Uncontroverted Fact 18.)  Mr. Southam was Clear Home's CEO and Mr. Hreinson was its president.  (Uncontroverted Fact 22.)  Although Clear Home acquired Clear Satellite's contract with

---

[2] When Clear Satellite was first incorporated, Mr. Southam and Mr. Hreinson owned the company with Mark Erskine, each owning a 33% share.  (Tr. 148 (Hreinson).)  Mr. Southam and Mr. Hreinson bought out Mr. Erskine in 2015.  (Id.)  Mr. Southam and Mr. Hreinson were 50% owners of Clear Satellite at the time the company filed its final tax return.  (Tr. 177 (Hreinson).)

DirecTV, it ended that relationship in 2021 and is now a customer acquisition company that finds customers for businesses like Amazon and DoorDash.  (Uncontroverted Facts 19–21.)  Mr. Southam and Mr. Hreinson are majority owners of Clear Home, owning a combined 92% of the company.  (Uncontroverted Fact 23.)

Clear Home operates out of a building located at 135 South Mountain Way Drive in Orem, Utah.  (Uncontroverted Fact 24.)  When they were operational, Goyo and Clear Satellite were also housed in the same building, although the entities operated from different floors and sections.  (Id.)  The parties dispute whether Goyo and the Clear Entities (Clear Satellite and Clear Home) maintained the appropriate corporate formalities, which the court discusses below.

## II.    The Service and Marketing Agreement

RWS and Goyo entered into a Service and Marketing Agreement (the Agreement) on August 24, 2015.  (Uncontroverted Fact 27; Agreement, Ex. 6.)  Mr. Southam signed the Agreement as president of Goyo and Mr. Thornberry signed the Agreement as president of RWS. (Uncontroverted Facts 28–29.)  The Agreement contemplated that Goyo would "design and offer a Real Estate Industry Concierge program bundle (the "Concierge Program") exclusively to RWS and its customers and RWS [would] work exclusively with Goyo for its bundling/concierge needs[.]"  (Ex. 6 at 1.)  Under the Agreement, RWS provided Goyo with leads, which consisted of "contact and other information pertaining to a future homeowner, or the homeowner themselves, obtained by RWS (or Goyo, to be submitted through RWS' systems) … during the home purchase process."  (Id.)  Goyo would then use the leads to contact new homeowners "to discuss exclusive deals on services and alarm monitoring systems …." (Id.)

While leads could also originate from real estate agents, direct websites, or other means,

Mr. Thornberry testified that "the predominant source was definitely home inspectors." (Tr. 32 (Thornberry).) The origin of the lead was important because, as described above, there was an "incremental cost" with leads that originated from home inspectors—namely, the lower cost that the home inspector had to pay for the warranty program. (Tr. 39 (Thornberry).) From RWS's point of view, every lead that originated from a home inspector cost approximately $17. (Id.)

Accordingly, the Agreement contained a revenue model that reflected the difference between leads from the "Home Inspection Platform" and leads from the "Real Estate Platform":

> In exchange for Leads generated from the Home Inspection Platform …, Goyo will pay to RWS the greater of 1) fifteen percent (15%) of the sales that arise as a result of the Leads from Concierge Services … plus the Alarm Revenue at $470.00 per unit, and 2) $17.00 per Home Inspection Platform Lead and $0.00 per Real Estate Platform Lead (no minimum fee on Real Estate Platform).

(Ex. 6 at 7.) In addition, the Agreement required Goyo to pay a Marketing Fee of $10,000 per month to RWS upon the delivery of a minimum of 1,000 leads (rising to 3,000 leads after seven months). (Id.) The Marketing Fee reflected the cost for marketing that RWS developed for the Concierge Program, including branding for the Real Estate Platform and the Home Inspection Platform. (Id. at 2.)

The Agreement specified that it was governed by Utah law and that any amendment or waiver to a provision of the Agreement could only occur "with the written consent of both Parties." (Id. at 5.) The Agreement noted that the Concierge Program would be "jointly branded" and included a provision that RWS would receive 20% of the net purchase price if Goyo sold the concierge branch of its business and met certain conditions. (Id. at 2.) Finally, the Agreement allowed either party the right to terminate with six months' prior written notice, provided that the terminating party paid any monies owed up to the termination date. (Id. at 4.)

### III.   Oral Modifications to the Agreement

Within a few months after signing the Agreement, Goyo began to fall behind on its

obligations.  Goyo provided the court a summary of its payments to RWS.[3]  (Goyo Payment

Summary, Ex. 143.)  By February 2016, Goyo had failed to pay one of the $10,000 marketing

fees.  (Id. (showing no payment for a $10,000 fee charged on January 31, 2016).)  While Goyo

did pay the next few invoices in full, these payments were often delayed by several months.[4]

Goyo agrees that RWS provided the required leads under the Agreement, and that Goyo

successfully used those leads to sell products through the Concierge Program.  (Tr. 347 (Jesse

Christiansen), 399 (Jeremy Jacob Assmus).)  But Mr. Southam testified that the leads did not

perform as well as expected: "I think we, in our minds, believed the leads would be a warmer

lead[.]"  (Tr. 244 (Southam).)  In other words, Mr. Southam believed that the new homeowners

would be more receptive to a sales call.  From Goyo's perspective, it was unclear what volume

and price of leads would allow the conversion rate—i.e., the leads that resulted in a successful

sale—to be profitable.  (Tr. 400 (Assmus) (agreeing that Goyo "wasn't profitable under the terms

of the agreement because they couldn't sell enough leads").)  Mr. Southam testified that Goyo

entered the Agreement "saying we don't know if $17 is a good number, or if $3 is a good

number, or $100" because the receptivity of new homeowners to a sales call depended, to some

extent, "on how well the home inspector warms them up …."  (Tr. 199 (Southam).)

---

[3] RWS does not contest these payments, and they are supported by the bank statements that
RWS's expert, Jeremy McGannon, attached to his expert report.  (See Goyo Bank Statements,
Ex. 95.)  The summary is also corroborated by a more complete list of all transactions between
Goyo and RWS, including payments and bills with relevant dates.  (Goyo & RWS Transactions,
Ex. 146, Tab 3.)

[4] For instance, Goyo did not pay bills for $125,388 and $10,000 issued on April 29 and 30, 2016,
until June 20, 2016.  (Ex. 143.)  Similarly, Goyo did not pay two bills totaling $152,683 issued
on May 31, 2016, until August 1, 2016.  (Id.)  The Agreement required Goyo to remit payment
by the fifteenth of every month.  (Ex. 6 at 7.)

As a result, the parties discussed and agreed to alter certain elements of the revenue model under the Agreement. (Uncontroverted Fact 37.) Mr. Thornberry testified that RWS made these adjustments "voluntarily and generously," and was hoping that making changes to the revenue model could create a lasting partnership with Goyo:

> Well, to some extent it was priming the pump, you know, hoping to see that payments would be caught up. And maybe, you know, you kind of have this idea that the party on the other side gets a little bit behind, gets frustrated. You know, they're stuck in that spot. So … if you can help them out of that spot, you know, you end up with a loyal partner paying for life.

(Tr. 44–45 (Thornberry).) At this time, a continued partnership also made sense for Goyo, even though Goyo was not yet profitable. Mr. Southam testified:

> I still believe there's a huge play in the real estate world, and mainly because my next-door neighbor is the president of the National Association of Realtors. … So if we prove this model with them, they were willing to take us to their 1.6 million members and put us inside their software. So that's why we were so committed to trying to figure out this secret recipe with Nathan and why Clear Satellite was willing to keep investing money into it.

(Tr. 200 (Southam).)

Trying to create a profitable partnership, RWS and Goyo experimented with three modifications to the original Agreement: the mixed lead fees model, the capped fees model, and the revenue share model.

## A. First Modification: Mixed Lead Fees

As a first attempt to find a "model where [RWS would] get paid regularly[,]" RWS began to charge only $7 instead of $17 to Goyo for certain leads. (Tr. 47 (Thornberry).) Specifically, RWS recognized that Goyo was struggling with alarm sales in some areas and agreed that another partner could share those leads and pursue alarm sales while Goyo "continue[d] to handle the utility and DirecTV side." (Id.) RWS discounted Goyo's lead price from $17 to $7 and then billed the remaining $10 to a third party who could contact the homeowner about

alarms.  (Tr. 96 (Thornberry); see also Tr. 332 (Christiansen) ("[I]n some areas in that lead

agreement we did not have the right to solicit home security services, as there were some other

parties involved in soliciting those on these leads.").)

This arrangement was never codified in a written and signed amendment.  (Tr. 99

(Thornberry), 245 (Southam).)  But subsequent invoices, including several of the invoices for

which RWS now seeks payment, reflected the classification of leads into two categories that

RWS charged at $17 and $7.  (See, e.g., February 2017 & May 2017 Invoices, Ex. 24 at

RWS_00001069–70.)  Neither party provided the court with all the invoices in this case, which

has made it difficult to determine when RWS began charging Goyo only $7 for some of the

leads.  But while the court finds that it is not necessary to fix an exact date when this change

occurred, it appears that the modification may have taken effect on or around February 4, 2016,

under the terms of an email from Mr. Thornberry to Mr. Christiansen and others.  (Email from P.

Nathan Thornberry to Jesse Christiansen, et al., Feb. 4, 2016, Ex. 11.)  The email stated that

"[t]his addendum … takes effect upon the day all parties agree to its terms" and noted that

"[e]ach of the lead recipient parties pays $17 for most leads, with exceptions that have been

defined (i.e. Canadian leads and real estate leads for Goyo [concierge])."[5]  (Id. at

GOYO017703–04.)

---

[5] To the extent that the modification took effect in February 2016, it does not appear to have
significantly reduced charges to Goyo.  The summary of charges and payments that Goyo
provided demonstrates that, in addition to the $10,000 monthly marketing fee, RWS charged
$71,196, $74,154, and $60,401 for leads in November 2015, December 2015, and January 2016,
respectively.  (Ex. 143.)  Lead prices rose to $98,396 in February 2016 and continued rising,
reaching a peak of $142,683 in May 2016.  (Id.)  Of course, the increase in price partly reflected
RWS's obligation under the Agreement to increase its lead delivery by a minimum of 100 leads
each month until, by the eighth month, RWS would be delivering a monthly minimum of 3,000
leads.  (Ex. 6 at 2.)  Still, 3,000 leads at even the higher price of $17 is only $51,000.  The
evidence suggests, then, that RWS was overdelivering its leads to Goyo—but Goyo never
objected.

Sharing leads between multiple sales partners created some new tensions. For instance, Mr. Thornberry noted that when RWS sold a partial lead to a third party for alarm sales, RWS "had to give that alarm company, one, the exclusive offer of an alarm to that client, and, two, a coordination of both the timing and the amount of sales activities, you know, dials[.]" (Tr. 96 (Thornberry).) While the leads were cheaper, Mr. Assmus testified that sharing the leads with another company decreased the conversion rates for Goyo. (Tr. 374 (Assmus).) And Mr. Christiansen testified that, at some point in 2016, Mr. Thornberry requested that Goyo only make two calls on a shared lead—rather than the seven calls contemplated in the Agreement. (Tr. 362 (Christiansen).) The goal of the call reduction was to prevent a homeowner from feeling overly solicited when their contact information was split among multiple sales partners. (Id.)

An August 24, 2016 email to Mr. Assmus from Justin Thacker, the head of technology and data reporting for RWS (see id.), stated: "Yeah, Nathan had requested all parties reduce calls down to two if no contact is made. We've been getting a lot of complaints lately on the shared leads. Is this process change something that can happen pretty quickly? I realize this reduces your call volume pretty dramatically." (Email from Justin Thacker to Jeremy Assmus, Aug. 24, 2016, Ex. 14 at GOYO009124.) Mr. Assmus responded:

> Yes it can change fast, but I have to admit paying $7 for a lead that I can't sell alarms to and am limited to only dialing 2 times and still having to pay for the concierge overhead are going to make these very over priced[.] We will definitely need to revisit these policies and the process[.]

(Email from Jeremy Assmus to Justin Thacker, Aug. 24, 2016, Ex. 14 at GOYO009124.)

Shortly before this email exchange, Mr. Christiansen and Mr. Thornberry discussed a second modification to the agreement—namely, capping the maximum monthly fees.

### B. Second Modification: $75,000 Capped Fees

Mr. Christiansen testified that, at some point in 2016, he and Mr. Thornberry agreed that

"our bill would max out at $75,000 per month to help us reach breakeven." (Tr. 330 (Christiansen).) Mr. Christiansen explained that he and Mr. Thornberry had discussions in which Mr. Christiansen stated that the lead payments were burdensome and that the parties needed to find an alternative arrangement. (Tr. 331 (Christiansen).) He also testified that Mr. Thornberry was "amicable" about trying different solutions. (Id.) Mr. Christiansen stated that he understood that the fee-capping arrangement would remain in effect until Goyo reached profitability, "and then we would probably have future discussions if this model worked or how to make it work going forward." (Id.)

The court finds that Mr. Christiansen's testimony is reliable for several reasons. First, both Mr. Southam and Mr. Assmus agreed that the parties operated under a capped fees arrangement for several months. (Tr. 202 (Southam), 372 (Assmus).) Mr. Southam testified as follows about the modified agreement:

> Nathan came to us and just said, hey, I've got to have a minimum of $75,000 to be able to pay my home inspectors to keep them happy. So we committed, you know. And so he said, hey, we're going to keep sending you the leads we can get you, but while we transition and try these other things, do a minimum of $75,000. We said, okay, great. We'll pay that.

(Tr. 202–03 (Southam).)

More importantly, Mr. Thornberry's testimony is consistent with such a modification. Although he characterized the agreement differently, describing the arrangement as one that was "aiming for $75,000" and stating that it wasn't "imperative" to bill at that amount, he nevertheless testified that he had waived fees that were above $75,000 several times: "[O]nce it's so close to $75,000, and there's an expectation, and we're actually receiving some money from them, we're getting some checks, yeah, I just waived five or six grand a few times." (Tr. 101 (Thornberry) (emphasis added).) On one occasion, Mr. Thornberry estimated what he described

12

as an "adjustment" to the lead fees as follows: "I think one month it was $86,000 down to $75,000.  It was an $11,000 waiver."  (Tr. 55 (Thornberry) (emphasis added).)

Finally, several emails exchanged between the parties corroborate the capped fees arrangement.  On August 9, 2016, Mr. Thornberry forwarded an email to Mr. Christiansen about outstanding amounts owed under three invoices that had been flagged by Jenny Thornberry, an employee at RWS and Mr. Thornberry's wife.[6]  (Emails re: $75,000, Ex. 17.)  The first invoice was for the $10,000 marketing fee from January 2016 that the court has already discussed above.[7]  The second invoice was for June 2016 leads totaling $90,059.  And the third invoice was for July 2016 leads totaling $97,091.  Mr. Christiansen responded: "I thought we agreed that our bill would max out at 75k per month to help us reach break even???"  (Id. at GOYO0017838.)  The record does not contain Mr. Thornberry's response, if any, to this message.  But subsequent emails exchanged between employees at Goyo reflect that multiple employees believed there was an arrangement to cap fees at $75,000 per month.  In response to Chris Redfern, an employee at Clear Satellite who forwarded an email from Ms. Thornberry containing an invoice for August 2016 lead fees totaling approximately $95,200,[8] Mr. Assmus replied: "[A]s far [I] have been told we stick to the 75k[.]"  (Id. at GOYO008936.)  And a few months later, again in response to Mr. Redfern—who was forwarding an email from Ms.

---

[6] The court will refer to Jenny as Ms. Thornberry for the purposes of this order, although Mr. Thornberry testified that the situation was more complicated: "We kind of consider ourselves to be married.  We'll call her wife."  (Tr. 100 (Thornberry).)

[7] The invoice for the January 2016 marketing fee is dated February 1, 2016.  (Ex. 17 at GOYO017838.)  To avoid confusion, the court refers to invoices according to the period covered (e.g., January 2016), not the date of the invoice, which is always the first day of the subsequent month (e.g., February 1, 2016).

[8] The copy of this email is missing the last two digits of the invoice amount.  (See Ex. 17 at GOYO08936.)  For the reasons discussed below, the court assumes that this amount is $95,234.

Thornberry containing an invoice for November 2016 lead fees totaling $81,692—, Mr. Assmus wrote that "per our previous agreement we will still just pay the 75k[. I] think they are sending the whole amount to show us what it would be." (Id. at GOYO008928.)

Based on the email exchange described above, in which Goyo first objected to the June 2016 invoice, the court finds that the capped fees arrangement began on June 1, 2016. Because there is no evidence that the parties otherwise agreed to end the fee cap, the court finds that the capped fees arrangement lasted until June 1, 2017, when the parties made yet another modification to the Agreement.

### C. Third Modification: Revenue Share Model

In May 2017, the parties developed a revenue share model in which Goyo "wouldn't be paying per lead anymore. [RWS] would be sending us whatever leads were available." (Tr. 380–81 (Assmus).) Mr. Thornberry testified that RWS would "select a group of leads" to send to Goyo and Goyo would pay RWS "on the actual sales of individual services[.]" (Tr. 52 (Thornberry).) Invoices from this period reflect commissions for DirecTV sales and for alarm sales. (See, e.g., December 2017 Invoice, Ex. 69 at RWS_00000019.) According to an email sent by Mr. Thornberry, "Full Concierge lead billing at lead rates ceased as of May 15[, 2017.]"[9] (Email from P. Nathan Thornberry to James Melad, et al., May 24, 2017, Ex. 29 at GOYO020186.)

Under the revenue share model, Goyo was required to provide RWS with accurate sales

---

[9] The parties agree that RWS continued to provide Goyo with lead costs even though RWS did not charge these fees. (Tr. 98 (Thornberry) (testifying that lead fees did not cease but that RWS had agreed to the revenue share model on a "temporary basis"), 406 (Assmus) (asserting that RWS continued to send invoices for the lead costs with the idea of "running a tally" so that "[i]f the rev share ever outweighs [the original contract terms], then we can go back to terms and change our negotiations").) This information is not otherwise in the record, as the invoices from this period reflect only commissions from DirecTV and alarm sales.

information about sales and installations made from the provided leads.  (See Tr. 407 (Assmus).)

Mr. Assmus agreed that "Goyo would have to provide RWS with the actual sales under the rev

share agreement."  (Id.)  The parties do not dispute that there was no signed written agreement

memorializing the revenue share arrangement.  (Tr. 54 (Thornberry) (agreeing that there was

never a signed addendum or amendment to the Agreement), 381 (Assmus) (testifying that

"Nathan and I changed stuff all the time" and agreeing that no signed document memorialized

the revenue share agreement).)

The court finds that the revenue share arrangement lasted from June 1, 2017,[10] until the

termination of the parties' relationship.  The final invoices on which RWS seeks damages for

breach of contract—for August and September of 2018—continue to reflect commissions from

alarm sales.  (See August 2018 & September 2018 Invoices, Ex. 24 at RWS_00001071–92.)

Although Mr. Assmus expressed surprise that Goyo was "even making phone calls" in

August 2018, neither Mr. Assmus nor any other witness disputed that the sales reflected in the

final invoices were accurate or suggested that the parties had discarded the revenue share model.

(See Tr. 414 (Assmus).)

## IV.   Proposed Amendment and Partnership Agreement

In December 2017, Mr. Thornberry and Mr. Southam exchanged several emails about a

potential partnership to create a company called Full Concierge LLC, in which RWS and Mr.

Southam would both be 50% owners.  (Emails between P. Nathan Thornberry and Paul Southam,

Ex. 43 at GOYO028815.)  Mr. Thornberry's proposal included a $6,000 monthly fee payable

---

[10] As discussed above, Mr. Thornberry's email terminating lead billing rates in favor of the
revenue share model dated this change to May 15, 2017.  (See Ex. 29 at GOYO020186.)  But
RWS did not begin billing under the revenue share model until the June 2017 invoice.  (See
June 2017 Invoice, Ex. 69 at RWS_00000013.)  The court therefore dates the change to
June 1, 2017.

over at least 100 months "until reaching aggregate $600,000." (Id. at GOYO028816.) In response to Mr. Southam's question asking what the $600,000 amount represented, Mr. Thornberry stated that it was the "[r]emaining balance on unpaid lead costs .... [I]t's basically me paying myself back for losses ...." (Id.) Mr. Southam pushed back against this proposal, writing: "If were [sic] going to pay you over time for your current loss then I'd like to add my 2 Million in loss into the same pot." (Id. at GOYO028814.) Mr. Thornberry and Mr. Southam also disagreed about the amount of control that RWS exerted over the lead costs.

The court generally agrees with Mr. Thornberry's perspective during this exchange, although, as discussed below,[11] the $600,000 figure is too high because it does not reflect the parties' capped fees arrangement. Nevertheless, Mr. Thornberry was citing to losses that stemmed directly from Goyo's inability to pay its invoices under the Agreement. In addition, the lead prices reflected real discounts that RWS provided to home inspectors. While RWS likely had more control over lead pricing than Mr. Thornberry was willing to admit, the lead fees reflected costs that RWS could have otherwise collected from home inspectors or other third-party vendors. In contrast, the losses cited by Mr. Southam also reflected Goyo's inability to become profitable; these losses represented the start-up costs the Clear Entities expended to get Goyo off the ground.[12] But these losses did not arise from any failure on the part of RWS to perform under the parties' Agreement.

In any event, the parties never signed a new contract to create Full Concierge LLC. Instead, the parties continued to negotiate potential amendments to the Agreement. Two central components of these negotiations were the resolution of Goyo's outstanding debt and the

---

[11] See infra, Findings of Fact § VI.

[12] See infra, Findings of Fact § VII.

creation of a relationship between RWS and Clear Satellite.  On March 14, 2018, Mr. Thornberry instructed his general counsel, Alix Vollmer, to draft an agreement with the following three provisions: 1) "RWS [would waive] the outstanding bill to Goyo in regards to per lead fees, but Goyo would pay immediately any per installation fees as agreed to"; 2) Goyo would transfer the Full Concierge phone numbers and website to RWS; and 3) "Goyo/ClearSat would not compete in any way for leads from the Home Inspector Market."  (Email from P. Nathan Thornberry to Alix Vollmer, Mar. 14, 2018, Ex. 51.)

After receiving the draft "Addendum" from Ms. Vollmer, Mr. Thornberry emailed the document to Mr. Southam, Mr. Assmus, and Mr. Christiansen, noting in his email that the parties would keep the "schedule of payments we have in place currently" (i.e., the revenue share model), and that "[t]he only substantive change so far as the agreement goes is that ClearSat would be tied to ensuring such payments occurred …."  (Email from P. Nathan Thornberry to Jeremy Assmus, et al., Mar. 23, 2018, Ex. 53 at GOYO017588.)  Finally, Mr. Thornberry stated that "[i]f at some point you guys wish to kill Goyo as a separate entity we will comply in making contract changes to appropriately reflect such."  (Id.)

The Addendum proposed to amend the parties to the original Agreement "to include Clear Satellite, Inc."  (Addendum, Ex. 53 at GOYO017590.)  The Addendum also stated that RWS would waive "all Lead fees, exclusive of accrued and future installation fees, due to it … as of 14 March 2018" in exchange for the following actions: 1) payment of accrued and future installation fees (i.e., the fees generated from sales during the revenue share period); 2) transfer of the Full Concierge toll-free phone numbers and website to RWS; and 3) an agreement not to compete.  (Id. at GOYO017590–91.)  Both Goyo and Clear Sat were required to comply with these actions, as the Addendum clarified that "Clear Sat and Goyo may be individually and

collectively referred to as 'Goyo' both in the Agreement and this Addendum." (Id. at GOYO017590.)

The parties did not sign the Addendum. Instead, on April 6, 2018, Goyo's counsel sent Mr. Thornberry a different proposal titled "First Amendment to the Service and Marketing Agreement" (First Amendment), summarizing the document as follows: "You will find the revenue share model described in detail, with the transfer of Concierge phone numbers and website to RWS, and the waiver of the old lead fees. We excluded Clear Satellite's name from the agreement since the original agreement was executed by Goyo and RWS." (Email from Pace Johnson to P. Nathan Thornberry, Apr. 6, 2018, Ex. 56.) The First Amendment stated that "Goyo and RWS shall share revenue on installed accounts instead of paying a flat fee for leads" and specified a fee of $136 for each DirecTV installation and $300 for each security system installation. (First Amendment, Ex. 56 at GOYO016371.) Additionally, the First Amendment provided for the following actions: RWS would "agree to waive its claim to alleged past-due Lead fees" and Goyo would "agree to transfer and assign to RWS all right, title, and interest" in the toll-free telephone numbers and the Full Concierge website. (Id. at GOYO016371–72.) Again, the parties did not sign the First Amendment.

Instead, Mr. Thornberry and Mr. Assmus exchanged emails about how much money Goyo still owed RWS for installation fees under the revenue share agreement. (See Emails Re: RWS Information, Apr. 16, 2018, Ex. 59.) Mr. Assmus shared a spreadsheet[13] breaking down the revenue share payments by the month the lead was provided and the month the installation occurred. (Id. at GOYO017162.) Based on that data, Mr. Assmus asserted that Goyo still owed RWS $29,113 from sales that occurred during the revenue share period. (Id. at GOYO017159.)

---

[13] See infra, Findings of Fact § VI, Table 2.

Mr. Assmus also noted that there were 34 pending jobs that should either be paid out or rolled into a new "Clear Home Partner Agreement."  (Id. at GOYO017159–60.)

A few days later, Mr. Assmus emailed two documents to Mr. Thornberry.  (Email from Jeremy Assmus to P. Nathan Thornberry, et al., Apr. 19, 2018, Ex. 60.)  The first was titled "Amendment to the Service and Marketing Agreement" (the Amendment).  The Amendment provided that Goyo would make a final payment to RWS of $29,113 "to cover services rendered under the orally revised revenue model[.]"  (Amendment, Ex. 60 at GOYO006742.)  The Amendment also noted that the parties "discussed and orally agreed to alter certain elements of the revenue models under the Original Agreement resulting in a dispute about the amount of Lead fees due" and that RWS would "waive its claim to alleged past-due Lead fees …."  (Id.)  Finally, the Amendment stated that Goyo would agree "to transfer and assign to RWS all right, title, and interest" in the toll-free telephone numbers and the Full Concierge website.  (Id. at GOYO006742–43.)

The second document was titled "Independent Dealer Sales Agreement" (the Partnership Agreement), which laid out the terms of a partnership agreement between RWS and Clear Home. (Partnership Agreement, Ex. 60 at GOYO006744.)  The Partnership Agreement authorized RWS to sell Clear Home products as a non-exclusive and independent sales organization and provided that RWS would receive a commission for any new deals brought to Clear Home.  (Id. at GOYO006745, GOYO006755.)  Mr. Southam testified that the purpose of this agreement was "to create Nathan as his own affiliate, just as Goyo used to be the affiliate of Clear Home and Clear Satellite."  (Tr. 224 (Southam).)  In addition, the Partnership Agreement included a list of 32 preexisting accounts, which the court finds corresponded to the 34 pending jobs that Mr. Assmus mentioned in his April 16, 2018 email.  (Id. at GOYO006760; Ex. 59 at GOYO017159–

60.)  Under the Partnership Agreement, Clear Home agreed "to pay [RWS] for every install of the 32 preexisting and pending accounts …."  (Partnership Agreement, Ex. 60 at GOYO006760.)

None of the parties—RWS, Goyo, or Clear Home—ever signed the Amendment or the Partnership Agreement.  Instead, Ms. Vollmer sent an email to Mr. Assmus on May 3, 2018, asking for word documents of the Amendment and Partnership Agreement because "[t]here are modifications that need to be made …."  (Email from Alix Vollmer to Jeremy Assmus, May 3, 2018, Ex. 61 at GOYO008063.)  An email from Mr. Thornberry later that month concerning the Full Concierge telephone numbers reflects that the parties still had not signed a new contract. (Email from P. Nathan Thornberry to Jeremy Assmus, et al., May 29, 2018, Ex. 62 (asking for the telephone numbers to be ported to RWS by the next day even though "we will not have an agreement by then").)

## V.    Termination of the Relationship

Although the parties did not sign the Amendment or Partnership Agreement, Goyo nevertheless performed some of the actions contemplated by the Amendment.  On May 29, 2018, Mr. Thornberry emailed Mr. Assmus and Mr. Christiansen stating: "The concierge numbers I need ported over to me tomorrow.  You guys simply aren't answering the phones, and they are my numbers I promoted.  I need them ported over tomorrow, without delay, and no we will not have an agreement by then but you're actively harming my business."  (Id.)  As noted above, this email demonstrates that the parties had not reached a resolution concerning the proposed Amendment and Partnership Agreement.  Even so, Goyo began to transfer the telephone numbers to RWS, a process which took considerable time to complete.  (Uncontroverted Fact 46; see also Emails Re: Telephone Numbers, Exs. 62–66, 83 (reflecting that Clear Home was following up about one of the telephone numbers as late as February 2019).)

Goyo also attempted to tender the $29,113 payment to RWS. (Uncontroverted Fact 47.) Mr. Southam testified that Goyo sent this payment to RWS on two separate occasions. (Tr. 225 (Southam).) But RWS never accepted payment and returned these checks. (Uncontroverted Fact 47.)

Finally, at some point, Goyo also transferred the Full Concierge website. Mr. Thornberry confirmed that the website currently lists biographies, email addresses, phone numbers, and mailing addresses that are associated with Mr. Thornberry's companies. (Tr. 114–15 (Thornberry); see also Full Concierge Website Screenshots, Ex. 144.) The court therefore finds that RWS controls the website and that Goyo must have transferred ownership at some point. But the timing of that transfer is disputed. Mr. Assmus testified that he was unsure about the exact date of transfer, but that he believed it occurred before the phone numbers were transferred. (Tr. 360–61, 390 (Assmus).) Mr. Southam also stated that he believed the transfer occurred before Goyo received the letter discussed below. (Tr. 207–08 (Southam).) In contrast, Mr. Thornberry testified that the transfer most likely occurred after RWS sent Goyo the letter. (Tr. 135 (Thornberry).)

On July 3, 2018, RWS sent Goyo and Clear Satellite a letter (the Demand Letter) demanding payment for Goyo's purported failure to pay 18 invoices. (Uncontroverted Fact 51; Demand Letter, Ex. 69.) The Demand Letter stated that Goyo had an outstanding balance of $582,960.16 and demanded the first of six equal payments ($97,160.19) to satisfy this debt within 10 days. (Ex. 69 at RWS_00000008.) The letter also included 16 of the unpaid invoices. (Id. at RWS_00000010–44.) Finally, the Demand Letter offered to waive $50,000 of the purported delinquent amount if Goyo transferred full ownership and access rights to the Full Concierge website. (Id. at RWS_00000008.) Given this offer, and the lack of any clear

21

recollections or evidence from the Defendants demonstrating that full ownership rights to the website had already been transferred, the court finds that the website most likely had not been transferred by the time Goyo received the Demand Letter.

No one from Goyo or the Clear Entities called RWS or otherwise responded to the Demand Letter.  (Tr. 207 (Southam).)  And no parties introduced evidence suggesting that either party terminated the Agreement.  (See Ex. 6 at 4 (allowing termination of the Agreement by either party with six months' written notice).)  Instead, RWS sent Goyo two additional invoices, totaling $104,778.50.  (See Ex. 24 at RWS_00001071–92.)  Goyo did not dispute these invoices, which appear to be based on sales and installation data provided by Goyo, and the court therefore finds that the final two invoices reflect an ongoing relationship between the parties.

That relationship ended upon Goyo's dissolution.  The final September 2018 invoice is dated October 1, 2018 (id. at RWS_00001087), and Goyo closed its operating account (along with its other bank accounts) in December 2018.  (Uncontroverted Fact 58.)  As authorized by Mr. Southam, Clear Home's Controller at the time, David Serpa, submitted a request to Chase Bank to close Goyo's accounts and transfer the balances to Clear Home's operating account. (Uncontroverted Fact 59; see also Email from David Serpa to Seema Pervez, Dec. 7, 2018, Ex. 76 (asking Chase Bank employee to close Goyo's accounts and stating: "Could you please transfer all ending balances to Clear Home's operating account?").)

## VI.  Accounting

A difficult aspect of this dispute—and one that has substantially delayed the court's decision—is that RWS and Goyo used different accounting methods throughout their relationship.  Moreover, neither side provided the court with a full record of the invoices issued from RWS to Goyo.  Instead, the parties provided only the invoices for which RWS seeks

outstanding payments.  (See Exs. 24 & 69.)  Nevertheless, the court has pieced together certain aspects of this accounting that likely led to a misunderstanding between the parties.

One major source of confusion stems from the different methods the parties utilized to calculate the invoices and payments while operating under the revenue share model.  For the period beginning on June 1, 2017, which is when the court finds RWS began billing under the revenue share model, until April 1, 2018, at which point the parties were engaged in discussions about the proposed Amendment and Partnership Agreement, RWS issued the invoices to Goyo that are reflected in Table 1.

**Table 1: RWS's Revenue Share Accounting**

| Period | Invoice (RWS) |
|--------|---------------|
| Jun-17 | $26,486.00 |
| Jul-17 | $16,728.00 |
| Aug-17 | $20,659.00 |
| Sep-17 | $15,912.00 |
| Oct-17 | $11,696.00 |
| Nov-17 | $16,876.00 |
| Dec-17 | $13,504.00 |
| Jan-18 | $15,356.72 |
| Feb-18 | $16,443.92 |
| Mar-18 | $20,520.93 |
| **TOTAL:** | **$174,182.57** |

During the same period, Goyo calculated the payments due as illustrated in Table 2.

**Table 2: Goyo's Revenue Share Accounting**

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| | Pay 9/1 | Pay 10/1 | Pay 11/1 | Pay 12/1 | Pay 1/16 | Pay 2/2 | Pay 3/1 | Pay 4/1 |
| Jun-17 | $23,776 | $542 | $1,897 | $271 | $2,100 | $0 | $0 | $0 |
| Jul-17 | $15,912 | $408 | $408 | | -$544 | $0 | $0 | $0 |
| Aug-17 | $10,336 | $10,323 | $3,252 | | -$813 | $0 | -$1,355 | $0 |
| Sep-17 | | $8,840 | $6,120 | $952 | | $0 | $0 | $0 |
| Oct-17 | | | $8,432 | $2,992 | $272 | $136 | $0 | $0 |
| Nov-17 | | | | $8,924 | $7,952 | $680 | $0 | $0 |
| Dec-17 | | | | | $13,504 | $5,852 | $544 | $0 |
| Jan-18 | | | | | | $10,808 | $10,232 | $813 |
| Feb-18 | | | | | | | $7,788 | $708 |
| Mar-18 | | | | | | | | $27,592 |
| | **$50,024** | **$20,113** | **$20,109** | **$13,139** | **$22,471** | **$17,476** | **$17,209** | **$29,113** |
| | | | | | | | **TOTAL:** | **$189,654** |

According to Goyo's accounting, Goyo owed RWS $189,654 during this period (calculated by adding the amounts in columns B through I), a figure that is over $15,000 more than the $174,182.57 amount that RWS charged in invoices.

This discrepancy arises because RWS charged for leads based on the month in which the leads were provided—for instance, $26,486 for leads provided in June 2017. Goyo, in contrast, paid for leads depending on when those leads converted to installations.[14] For the June 2017 leads, for instance, Goyo paid $23,776 in commissions for installations that occurred by September 1, 2017; an additional $542 for installations that occurred by October 1, 2017; and so on. Adding the first four numbers in the June 2017 row of Table 2 ($23,776 + $542 + $1,897 + $271) results in a total amount of $26,486—which is exactly the amount charged by RWS for June 2017 leads. That figure does not include an additional $2,100 for sales that occurred by

---

[14] Mr. Assmus explained Goyo's spreadsheet in an email to Mr. Thornberry. (Email from Jeremy Assmus to P. Nathan Thornberry, Apr. 16, 2018, Ex. 59 at GOYO017159.) Mr. Assmus indicated that the columns represented installation months and gave the following example: "[S]o if we got the lead in [O]ctober and it was installed in [D]ecember … the pay would be in column E line 6[.]" (Id.)

January 16, 2018, perhaps because these sales occurred too late for RWS to include them in its invoice.

A similar pattern occurs for the remaining months. RWS charged $16,728 for leads provided in July 2017—a figure which corresponds to the sum of the first three payments Goyo made for installations from July 2017 leads ($15,912 + $408 + $408), but which does not include $544 in credits that were issued by January 16, 2018. RWS charged $20,659 for leads provided in August 2017, which corresponds to the first two payments made by Goyo for these leads but does not include an additional payment of $3,252 or two credits for $813 and $1,355. RWS charged $15,912 for leads provided in September 2017, a figure that matches the total amount of payments made by Goyo for these leads. RWS charged $11,696 for October 2017 leads, a figure that matches the first three payments Goyo made for these leads. RWS charged $16,876 for November 2017 leads, matching the first two payments made by Goyo. RWS charged $13,504 for December 2017 leads, matching the first payment made by Goyo. The remaining figures, for leads provided in January, February, and March 2018, have no clear match.

The court makes two findings about this record. First, it appears that RWS's figures may be an undercounting, as Goyo made certain payments corresponding to each month's leads several months after RWS provided those leads. Nevertheless, the court adopts the figures in RWS's invoices because RWS continued to earn commissions from sales that resulted from its leads until October 1, 2018. Goyo did not object to the later invoices (which, as discussed above, were based on sales figures provided by Goyo itself), and any undercount in RWS's earlier invoices is potentially reflected in these later invoices. In any event, RWS has not questioned its invoices for this period, despite the higher amounts indicated by Goyo.

Second, the court finds that Goyo made payments during this period that clearly

25

correspond to leads provided under the revenue share agreement.  Table 3 reflects the amount of these payments, the date on which these payments were made, and the columns listed in Table 2 to which these payments correspond:

**Table 3: Goyo Payments during the Revenue Share Period**

| Date | Payment | Columns |
|---|---|---|
| 9/1/2017 | $50,024.00 | B |
| 10/10/2017 | $20,113.00 | C |
| 12/13/2017 | $33,248.00 | D & E |
| 2/21/2018 | $39,947.00 | F & G |
| 3/15/2018 | $17,209.00 | H |
| **TOTAL:** | **$160,541.00** | |

These payments are also reflected in bank statements provided by Goyo.  (See Email from Mark Santiago to Chris Eastman & Jesse Christiansen, Apr. 9, 2018, Ex. 57 (attaching "screen shots showing the payments for leads from Residential Warranty Services from June 2017 through Feb 2018").)  From Goyo's perspective, it made $160,541 in payments during the revenue share period and owed an additional $29,113 at the time the parties were negotiating the proposed Amendment.  (See supra, Column I in Table 2.)

But Goyo's payments during this period are not reflected in the invoices that are in the record.  The invoices on which RWS seeks judgment include the ten invoices listed in Table 1, as well as five previous invoices and five subsequent invoices.  (See Exs. 24 & 69.)  According to RWS, Goyo made no payments on any of the invoices issued during the revenue share period.  In RWS's view, then, what happened to the $160,541 that Goyo paid between September 1, 2017, and March 15, 2018?  To answer that question, the court must examine the accounting from the beginning of the parties' relationship and trace that accounting through each modification that the parties made to the Agreement.

The parties do not dispute the amounts owed or the payments made under the original

Agreement or under the first modification when RWS charged Goyo only $7 on certain leads.

Table 4 reflects the amounts owed and paid during this period.

**Table 4: Invoices and Payments (Original Agreement and Mixed Lead Fees)**

| Period | Charged (RWS) | Paid (Goyo) | Owed |
|--------|--------------|-------------|------|
| Oct-15 | $75,658.00 | $75,658.00 | $0.00 |
| Nov-15 | $81,196.00 | $81,196.00 | $0.00 |
| Dec-15 | $84,154.00 | $84,154.00 | $0.00 |
| Jan-16 | $70,401.00 | $60,401.00 | $10,000.00 |
| Feb-16 | $108,396.00 | $108,396.00 | $0.00 |
| Mar-16 | $139,066.00 | $139,066.00 | $0.00 |
| Apr-16 | $135,388.00 | $135,388.00 | $0.00 |
| May-16 | $152,683.00 | $152,683.00 | $0.00 |
| | | **TOTAL:** | **$10,000.00** |

The parties agree that the only outstanding payment that Goyo has yet to pay from this period is a $10,000 marketing fee from January 2016.

But the parties' accounts diverge under the Agreement's second modification, in which the parties agreed to a $75,000 cap on lead fees.  As indicated in the emails exchanged between the parties, the invoices generated by RWS showed the full amount of lead fees.  (See Ex. 17.) But Goyo believed that RWS was waiving the additional fees above the $75,000 cap.  Table 5 reflects the payments made and the amounts that Goyo believed remained due during this period.

**Table 5: Invoices and Payments According to Goyo ($75,000 Capped Fees)**

| Period | Charged (RWS) | Paid (Goyo) | Owed |
|--------|---------------|-------------|------|
| Jun-16 | $90,059.00[15] | $75,000.00 | $0.00 |
| Jul-16 | $97,091.00 | $75,000.00 | $0.00 |
| Aug-16 | $95,234.00[16] | $75,000.00 | $0.00 |
| Sep-16 | $66,494.00 | $66,494.00 | $0.00 |
| Oct-16 | $80,279.00 | $80,239.00 | $40.00 |
| Nov-16 | $81,692.00 | $75,000.00 | $0.00 |
| Dec-16 | $62,377.00 | $50,000.00 | $12,377.00 |
| Jan-17 | $60,501.00 | $0.00 | $60,501.00 |
| Feb-17 | $81,447.00 | $0.00 | $81,447.00 |
| Mar-17 | $115,405.00 | $0.00 | $115,405.00 |
| Apr-17 | $114,458.00 | $0.00 | $114,458.00 |
| May-17 | $69,800.00 | $0.00 | $69,800.00 |
| | | **TOTAL:** | **$381,110.00** |

Two figures in this table require explanation. First, it is unclear why Goyo paid $80,239 for leads in October 2016. Not only was the correct amount $80,279 (i.e., $40 more), but the amount Goyo paid was in excess of the $75,000 cap. Likely, Goyo did not recognize that the payment was too high because Goyo paid off that invoice as part of a lump sum payment of $221,733 on November 17, 2016, which included $66,494 for the September 2016 invoice, as well as a payment for the August 2016 invoice (which Goyo <u>did</u> reduce from approximately $95,200 to $75,000). (<u>See</u> Ex. 143 at 3.) Because this lump sum payment was less

---

[15] The parties did not provide the court with the invoices for lead fees generated from June 2016 through January 2017. But the court has been able to derive the amounts changed in the June 2016, July 2016, August 2016, and November 2016 invoices from Trial Exhibit 17, which contains emails from Ms. Thornberry with attached invoices. (<u>See</u> Ex. 17 at GOYO017838, GOYO008936, GOYO005841.) The amounts charged in the September 2016, October 2016, December 2016, and January 2017 invoices are reflected in the summary of payments Goyo provided. (Ex. 143 at 3; <u>see also</u> Ex. 146, Tab 3.)

[16] The final two digits of this number have been cut off. (<u>See</u> Ex. 17 at GOYO008936.) The amount is therefore between $95,200 and $95,299, an uncertainty that is insignificant. For the reasons discussed below, the court believes that this amount is $95,234.

than $225,000 (i.e., less than three months at a capped fee of $75,000), it is possible Goyo did not notice that the payment for leads generated in October 2016 exceeded the $75,000 cap.

Second, Goyo's records reflect a $114,458 charge for leads provided in April 2017. (<u>See</u> Exs. 143 & 146, Tab 3.) This amount is $2,156 higher than the $112,302 amount indicated in the April 2017 invoice provided by RWS. (<u>See</u> April 2017 Invoice, Ex. 69 at RWS_00000012.) As discussed below, the court finds that this $2,156 difference provides a helpful key to the accounting.

Mr. Thornberry testified that, during this period, RWS waived several of the lead fees to the extent they exceeded $75,000. But there is no evidence that RWS ever changed its records to reflect these waivers. Table 6 indicates the amounts owed by Goyo on these invoices from RWS's perspective, as of June 1, 2017, when the parties switched to the revenue share model.

**Table 6: Invoices and Payments According to RWS ($75,000 Capped Fees)**

| Period | Charged (RWS) | Paid (Goyo) | Owed |
|--------|---------------|-------------|------|
| Jun-16 | $90,059.00 | $75,000.00 | $15,059.00 |
| Jul-16 | $97,091.00 | $75,000.00 | $22,091.00 |
| Aug-16 | $95,234.00 | $75,000.00 | $20,234.00 |
| Sep-16 | $66,494.00 | $66,494.00 | $0.00 |
| Oct-16 | $80,279.00 | $80,239.00 | $40.00 |
| Nov-16 | $81,692.00 | $75,000.00 | $6,692.00 |
| Dec-16 | $62,377.00 | $50,000.00 | $12,377.00 |
| Jan-17 | $60,501.00 | $0.00 | $60,501.00 |
|  |  | **SUBTOTAL:** | **$136,994.00** |
| Feb-17 | $81,447.00 | $0.00 | $81,447.00 |
| Mar-17 | $115,405.00 | $0.00 | $115,405.00 |
| Apr-17 | $112,302.00 | $0.00 | $112,302.00 |
| May-17 | $69,800.00 | $0.00 | $69,800.00 |
|  |  | **TOTAL:** | **$515,948.00** |

The court includes a subtotal of the amount owed ($136,994) as of February 1, 2017, because this figure helps explain the misunderstanding between the parties. Mr. Thornberry

testified that, when RWS received payments, it applied them to the oldest outstanding invoice.[17] (Tr. 79 (Thornberry).)  In contrast, Mr. Assmus testified that he was unaware of how RWS applied money that it received from Goyo to its statements.  (Tr. 413 (Assmus).)  The court finds that, despite testimony that RWS waived a number of fees in excess of $75,000 from June 1, 2016, to June 1, 2017, RWS nevertheless applied future payments from Goyo that RWS received while the parties were operating under the revenue share agreement to older invoices <u>as those invoices were originally charged by RWS</u>.  In other words, RWS never waived any fees in excess of $75,000.

If no fee cap had been in effect, then Goyo would have owed $136,994 on invoices from the capped fees period as of February 1, 2017.  Goyo had made what RWS considered only partial payments of $75,000 on several invoices, a partial payment of $50,000 for the December 2016 lead fees, and no payment at all on the $60,501 invoice for leads provided in January 2017.  Later, from September 1, 2017, to March 15, 2018 (during the revenue share period), Goyo made the five separate payments, totaling $160,541, which are listed above in Table 2.  The first four of these payments totaled $143,332, an amount that RWS—applying payments to the oldest outstanding invoices—applied to the outstanding balance of $136,994.  It also appears that RWS gave Goyo a credit of $2,156 to reflect that, at some point, the invoice for leads provided in April 2017 changed from $114,458 to $112,302.  Applying Goyo's first four payments during the revenue share period and the credit to Goyo's outstanding balance ($143,332 + $2,156 – $136,994) yields an excess payment of $8,494—which is exactly the

---

[17] This statement is not entirely accurate, as RWS asserts that Goyo owes $10,000 for marketing fees from January 2016 even though Goyo made hundreds of thousands of dollars in payments after that date.  Besides this anomaly, however, the evidence supports Mr. Thornberry's testimony.

amount of one of the two payments reflected in the invoice for February 2017 that RWS provided to the court.  (See Ex. 24 at RWS_00001069.)

The February 2017 invoice charges $81,447 for lead fees and reflects two payments: 1) a payment of $8,494 on February 22, 2018; and 2) a payment of $17,209 on March 15, 2018. (See id.)  The second payment clearly corresponds to the fifth payment made by Goyo during the revenue share period (see supra, Table 2), which was the last payment Goyo made to RWS. Both RWS and Goyo list this payment as Wire #5034910789.  (See Ex. 24 at RWS_00001069; Ex. 57 at GOYO016462.)  The inclusion of this payment towards the February 2017 invoice demonstrates that RWS was applying the payments that Goyo made during the revenue share period to invoices from the capped fees period.

But the $8,494 payment is a mystery, as Goyo's bank records do not include any such payment on February 22, 2018.  Goyo did, however, make a payment of $39,947 on February 21, 2018—the fourth payment Goyo made during the revenue share period.  The only reasonable explanation for the $8,494 figure in the February 2017 invoice is that this figure reflects the funds remaining from the $39,947 payment after RWS had applied that payment to outstanding amounts from previous invoices.  Indeed, RWS's records list this $8,494 payment as Wire #5033435319 (see Ex. 24 at RWS_00001069), which is the same wire number for the $39,947 payment in Goyo's records (see Ex. 57 at GOYO016463).  The court's explanation matches the evidence perfectly if two assumptions are accurate: 1) that the $8,494 figure includes a $2,156 credit that RWS provided to Goyo at some unknown point after adjusting the April 2017 invoice by that amount; and 2) that the August 2017 invoice, of which only the first three digits are legible ($95,2XX) was for $95,234.

These assumptions are corroborated by the total amount that RWS asserts is still owed by

Goyo.  Looking at the revenue share period first from Goyo's perspective, Goyo made $160,541 in payments, which can be applied to the invoices generated by RWS during this period as illustrated in Table 7.

**Table 7: Invoices and Payments According to Goyo (Revenue Share Model)**

| Period | Charged (RWS) | Paid (Goyo) | Owed |
|--------|--------------:|------------:|-----:|
| Jun-17 | $26,486.00 | $26,486.00 | $0.00 |
| Jul-17 | $16,728.00 | $16,728.00 | $0.00 |
| Aug-17 | $20,659.00 | $20,659.00 | $0.00 |
| Sep-17 | $15,912.00 | $15,912.00 | $0.00 |
| Oct-17 | $11,696.00 | $11,696.00 | $0.00 |
| Nov-17 | $16,876.00 | $16,876.00 | $0.00 |
| Dec-17 | $13,504.00 | $13,504.00 | $0.00 |
| Jan-18 | $15,356.72 | $15,356.72 | $0.00 |
| Feb-18 | $16,443.92 | $16,443.92 | $0.00 |
| Mar-18 | $20,520.93 | $6,879.36 | $13,641.57 |
| Apr-18 | $5,436.00 | $0.00 | $5,436.00 |
| May-18 | $11,007.90 | $0.00 | $11,007.90 |
| Jun-18 | $29,082.66 | $0.00 | $29,082.66 |
| Jul-18 | $0.00 | $0.00 | $0.00 |
| Aug-18 | $77,462.55 | $0.00 | $77,462.55 |
| Sep-18 | $27,315.95 | $0.00 | $27,315.95 |
| **TOTAL:** | **$160,541.00** | | **$163,946.63** |

But because RWS applied the $160,541 in payments that Goyo made during the revenue share period to invoices from the capped fees period, RWS's records reflect that Goyo still owes the full amount on every invoice from the revenue share period, as illustrated in Table 8.

**Table 8: Payments and Invoices According to RWS (Revenue Share Model)**

| Period | Charged (RWS) | Paid (Goyo) | Owed |
|--------|--------------:|------------:|------:|
| Jun-17 | $26,486.00 | $0.00 | $26,486.00 |
| Jul-17 | $16,728.00 | $0.00 | $16,728.00 |
| Aug-17 | $20,659.00 | $0.00 | $20,659.00 |
| Sep-17 | $15,912.00 | $0.00 | $15,912.00 |
| Oct-17 | $11,696.00 | $0.00 | $11,696.00 |
| Nov-17 | $16,876.00 | $0.00 | $16,876.00 |
| Dec-17 | $13,504.00 | $0.00 | $13,504.00 |
| Jan-18 | $15,356.72 | $0.00 | $15,356.72 |
| Feb-18 | $16,443.92 | $0.00 | $16,443.92 |
| Mar-18 | $20,520.93 | $0.00 | $20,520.93 |
| Apr-18 | $5,436.00 | $0.00 | $5,436.00 |
| May-18 | $11,007.90 | $0.00 | $11,007.90 |
| Jun-18 | $29,082.66 | $0.00 | $29,082.66 |
| Jul-18 | $0.00 | $0.00 | $0.00 |
| Aug-18 | $77,462.55 | $0.00 | $77,462.55 |
| Sep-18 | $27,315.95 | $0.00 | $27,315.95 |
| | | **TOTAL:** | **$324,487.63** |

(See Exs. 24 & 69.)

Therefore, according to RWS, Goyo owes the following amounts: $10,000 (see Table 4), $515,948 (see Table 6), and $324,487.63 (see Table 8), minus the $160,541 in payments that Goyo made during the revenue share period (see Table 3), which the court finds RWS applied to outstanding invoices from the capped fees period. These numbers total to $689,894.63, a figure that is exactly $2,156 greater than the $687,738.63 that RWS seeks in this litigation for breach of contract damages. This discrepancy makes sense if, as the court assumes, RWS provided Goyo a credit of $2,156—to account for an adjustment of the April 2017 invoice from $114,458 to $112,302—that is reflected in the $8,494 figure applied to the February 2017 invoice. Having credited that amount towards the February 2017 invoice, RWS should have used the higher amount of $114,458 for the April 2017 invoice when calculating the total amount owed to avoid double counting the credit. But because RWS both applied this credit to the February 2017

33

invoice and used the lower adjusted amount for the April 2017 invoice, RWS's requested damages are exactly $2,156 lower than the (more accurate) amount calculated by the court.

Although there are gaps in the evidentiary record that have required the court to make these minor assumptions, the court finds no need for a further evidentiary hearing. Regardless of how RWS applied or did not apply a $2,156 credit, and regardless of whether RWS charged Goyo $95,234 or some other amount of approximately $95,200 for the August 2016 invoice, the record is clear that RWS applied Goyo's revenue share payments to earlier invoices and there is no evidence that RWS ever waived fees in excess of $75,000 as the parties had agreed upon during the capped fees period.

Most importantly, there is no dispute about the total amount of money that Goyo paid to RWS. Goyo provided two exhibits that summarize the bills it received from RWS and the payments it made. Trial Exhibit 143, a summary of these amounts, reflects that Goyo paid RWS $1,494,216 over the course of their relationship.[18] Trial Exhibit 146[19] is more difficult to read, as all amounts for both bills and payments are reflected in each of the debit and credit columns. Goyo's counsel incorrectly added all these amounts together, coming up with a figure of $3,222,119 for payments from Goyo to RWS. (Ex. 146, Tab 3.) That figure double counts every payment made and includes certain outstanding bills. A careful parsing of only amounts that are categorized as payments in the first column (under "Type") reveals that Goyo paid RWS a total of $1,494,216—a figure that reflects the summary of payments in Trial Exhibit 143.

---

[18] This court excludes the "payment" of $8,494 dated February 22, 2018, from this calculation. As the court has found, there is no payment matching this amount in Goyo's bank records; the figure instead reflects a $2,156 credit for the adjustment of the April 2017 invoice and a credit for the money remaining after RWS applied Goyo's first four payments made during the revenue share period to older invoices.

[19] The relevant spreadsheet is found on the third tab of the Excel file.

RWS also presented evidence that agrees with this amount. The court heard testimony from Jeremy McGannon, a certified public accountant (CPA), who was an expert witness for RWS. While explaining a summary of his findings, he stated that Goyo made "just over $1.4 million of payments" to RWS. (Tr. 280 (Jeremy McGannon).) In a follow-up question, RWS's counsel confirmed that the exact payment figure was $1,418,558. (Tr. 280; see also Ex. 140, Slide 17.) The court finds that the reason this figure is slightly different from the $1,494,216 figure in Goyo's records is that Mr. McGannon neglected to include the first two payments by Goyo, which were made by check instead of through an Automated Clearing House (ACH) payment to RWS.[20] The ACH payments are much more easily identifiable as payments to RWS in Goyo's bank records.[21] Adding those two initial payments ($18,598 and $57,060) to the amount cited by Mr. McGannon ($1,418,558) results in a total of $1,494,216—an exact match to the figure in Goyo's books. The court therefore finds that Goyo made payments totaling $1,494,216 to RWS over the course of the parties' business relationship.

Because the parties do not dispute the total amount of payments that Goyo made—and because the record is sufficient to determine the total amount that Goyo owed under the Agreement and its various modifications—the court finds that it is inconsequential whether the court's assumptions about the $2,156 credit and the exact value of the approximately $95,200 invoice are correct. Nevertheless, the explanation about how the parties differed in their

---

[20] Trial Exhibit 95 contains a copy of Goyo's bank records. Although the exhibit is not numbered, nor are the bank statements in order, the court located the account statement for October 31, 2015, through November 30, 2015. That statement confirms that Goyo paid a check for $18,598 on November 10, 2015, and a check for $57,060 on November 19, 2015. These figures match the amounts in Goyo's records.

[21] Again relying on Trial Exhibit 95, the court has cross-referenced the remaining payments that Goyo made to RWS. These payments are all labeled "Online ACH Payment [Payment No.] To Residential Warranty Services (_######2388)." As discussed above, there is no payment for $8,494 in February 2018.

accounting methods is useful for understanding the widely conflicting testimony between the parties about the amounts owed under the Agreement.

For instance, Mr. Assmus testified that Goyo owed around $225,000 at the time the parties were negotiating the Amendment.  (Tr. 384 (Assmus).)  In contrast, Mr. Thornberry wrote Mr. Southam that Goyo had an outstanding debt of $600,000 around the same time. (Ex. 43 at GOYO028816.)  Both parties' testimony was mostly accurate based on their respective accounting—but both parties' accounting was incorrect, albeit for different reasons. Goyo's books failed to reflect the invoices from May 2017 onward, thereby omitting a balance of approximately $240,000 at the time of the parties' April negotiations.  And RWS failed to credit Goyo's payments during the revenue share period to the revenue share invoices, inappropriately applying them to fees in excess of $75,000 that had been waived, resulting in an overestimate of approximately $140,000.  Even making these corrections would not have wholly fixed the dispute about the invoices, as the February, March, and April 2017 invoices generated by RWS reflected fees in excess of the $75,000 cap.  But had the parties kept more careful records that reflected the modifications made to the Agreement, their negotiations about resolving the outstanding balance may have been much more productive.

**VII.  Relationship between Goyo and the Clear Entities**

The parties dispute various aspects of the relationship between Goyo and the Clear Entities.  Although Goyo worked out of the same building as Clear Satellite and later Clear Home,[22] Mr. Southam testified that Goyo had its own employees, with around 100 to 150 people cycling through during the time that Goyo was operational.  (Tr. 247 (Southam).)  These

---

[22] The exterior of the building at 135 South Mountain Way Drive had a "Clear Satellite" sign over the main entrance, which was later replaced by the "Clear Home" logo.  (Uncontroverted Fact 25.)

employees received W-2 forms from Goyo and their paystubs indicated that Goyo was their employer.  (Tr. 329–30 (Christiansen), 388 (Assmus).)

Nevertheless, there was a substantial overlap of ownership interests between Goyo and the Clear Entities.  During the relevant period, Goyo was owned by Mr. Southam and Mr. Hreinson.  (Uncontroverted Fact 5.)  Although Mr. Christiansen and two other individuals could acquire equity in Goyo if certain benchmarks were met, these individuals never acquired that equity because Goyo never become profitable.  (Id.; Tr. 328 (Christiansen).)  Accordingly, Mr. Southam and Mr. Hreinson both owned 50% of Goyo when it dissolved.  (Uncontroverted Fact 9.)  Mr. Southam and Mr. Hreinson also owned 50% each of Clear Satellite. (Uncontroverted Fact 17.)  After Clear Satellite and Now Communications merged, Clear Home had nine original owners.  (Tr. 173 (Hreinson).)  But Mr. Southam and Mr. Hreinson are now majority owners of Clear Home, owning a combined 92% of the company.  (Uncontroverted Fact 23.)

In some ways, Goyo maintained a distinct business identity separate from the Clear Entities.  For instance, there was little employee overlap.  (Tr. 248 (Southam).)  Goyo maintained a separate bank account and filed its own tax returns.  (Tr. 227–28, 243 (Southam).)  Goyo also had its own management team.  (Tr. 244 (Southam).)  For instance, Mr. Christiansen had full control over day-to-day operations while he was at Goyo.  (Tr. 243 (Southam).)  Although Clear Satellite paid the expenses for the building maintenance, Goyo often disputed its appropriate share of those expenses.  (Tr. 180 (Hreinson), 329 (Christiansen).)

But despite these differences, the court finds that Goyo was financially dependent upon and controlled by the Clear Entities.  In addition to his certification as a CPA, RWS's expert witness, Mr. McGannon, is accredited in business valuation (ABV) and certified in financial

forensics (CFF).  (Tr. 255 (McGannon).)  He is a Senior Managing Director at FTI Consulting, a global business advisory firm, and specializes in financial investigations of fraud, cash tracing, and commercial damages assessments.  (Tr. 257–58, 260 (McGannon).)  At the time of trial, he had approximately fifteen years of experience working in these areas.  (Tr. 260 (McGannon).)  The court finds that Mr. McGannon's testimony was credible and persuasive.

Mr. McGannon performed a forensic analysis of bank and financial statements for Goyo and the Clear Entities, focusing on the period from January 2015 through November 2018.  (Tr. 267–68, 277 (McGannon).)  The parties do not dispute that, during this period, there were cash inflows of $11,474,940 into Goyo's operating account.  (Uncontroverted Fact 55.)  Of that amount, approximately $10,585,448, or 92.2%, came from either Clear Satellite or Clear Home.  (Uncontroverted Facts 55–56.)  During that same period, Goyo transferred only $252,293 to the Clear Entities.  (Uncontroverted Fact 57.)

The court finds that Goyo relied on the Clear Entities to pay its operating expenses.  (See Tr. 291 (McGannon).)  When Mr. Christiansen needed money, he would ask Mr. Southam and Mr. Hreinson to transfer the necessary funds.  (Tr. 165 (Hreinson).)  Often, these funds landed in Goyo's account directly before Goyo paid its bills.  (Tr. 283–85 (McGannon).)  Mr. McGannon provided several examples.  In November 2016, for instance, Goyo made two payments to RWS (for $221,733 and $75,000) that would not have been possible without an inflow of a nearly identical amount from Clear Satellite.  (Tr. 283 (McGannon).)  Similarly, on February 21, 2018, Goyo made a payment of $39,947 to RWS after a transfer of approximately the same amount to Goyo's account from Clear Home that day.  (Tr. 284 (McGannon).)  And this pattern occurred not only when Goyo needed to make a payment to RWS, but also when Goyo had other expenses.  For instance, in June 2018, Clear Home transferred $66,000 into Goyo's operating

account; the next day, Goyo made several payments to the IRS and the State of Utah that would not have been possible without these funds. (Tr. 284–85 (McGannon).) Similarly, Goyo received $66,733 from Clear Satellite in December 2016, which enabled Goyo to make several payments to American Express, a vendor, and another individual. (Tr. 285 (McGannon).)

Goyo does not dispute that it often received money from the Clear Entities; indeed, multiple witnesses confirmed that Goyo received these funds, but characterized the transfers as loans. (Tr. 164 (Hreinson, 210 (Southam), 378 (Assmus).) Mr. Assmus testified that the Clear Entities expected these transfers to be repaid. (Tr. 377–78 (Assmus).) And Mr. Hreinson testified that Clear Satellite recorded each transfer in its accounting files. (Tr. 167, 174–75 (Hreinson).) Mr. Southam corroborated that account, noting that Clear Satellite tracked the amounts owed almost down to the penny, including for expenses such as shared overhead and even smaller items, like pizza. (Tr. 228 (Southam); see also Tr. 175 (Hreinson) (stating that Mr. Hreinson once got in a fight about stamps that weren't recorded properly).)

The court agrees that Goyo and the Clear Entities did track these transfers. The parties presented evidence that Mr. Southam and Mr. Hreinson tracked the cash balances for their businesses on a combined basis through a "Snapcash" file, which contained summaries of the bank accounts for Goyo, Clear Home, Clear Satellite, and other companies. (Tr. 293–94 (McGannon); Ex. 140, Slide 42.) Mr. Hreinson testified that funds in the amount of $2,483,240.25 that Clear Satellite provided to Goyo between 2012 and 2017 were "separate and distinct from the compensation that Goyo was paid by Clear Satellite." (Tr. 175 (Hreinson); see also Clear Satellite Funds to Goyo, Ex. 138 (showing Goyo's operational expenses and cash "loans" that Clear Satellite provided to Goyo).) Mr. Southam testified that he considered the $2.4 million in transfers to be money he lost on the Goyo venture. (Tr. 244 (Southam).)

But even if the Clear Entities carefully accounted for these transfers, the court is not persuaded that these transfers were "intercompany loans." (See Tr. 174 (Hreinson).) Importantly, there were no written loan agreements, no promissory notes, no terms under which the loans were provided, and no interest rates. (Tr. 167, 179, 184 (Hreinson), 209–10 (Southam), 274–75 (McGannon).) On cross examination, Mr. Southam admitted that loan documents were important for taxing authorities to determine whether money going into a company should be considered debt or capital. (Tr. 211–12 (Southam).)

It was difficult to understand how the business relationship functioned between Goyo and the Clear Entities. Mr. Hreinson and Mr. Southam testified that Goyo was an affiliate of Clear Satellite and Clear Home (Tr. 175 (Hreinson), 224 (Southam)) and Mr. Southam maintained that Clear Satellite paid all amounts owed to Goyo. (Tr. 229 (Southam).) Presumably, given Mr. McGannon's testimony that the Clear Entities paid Goyo $10,585,448 from January 2015 to November 2018, while Trial Exhibit 138 records only $2,483,250 in funds transferred from Clear Satellite to Goyo from 2012 to 2017, a large portion of the money that Goyo received from the Clear Entities was as compensation—and not as a loan.

But just as the Defendants provided no loan documents, they also failed to show how the Clear Entities paid Goyo for the relevant services. While it is undisputed that Goyo had an agreement with Clear Satellite for Goyo to procure customers for Clear Satellite (see Uncontroverted Fact 14), the Defendants presented no invoices or other bills tracking these payments. In fact, that there was no written agreement at all between Goyo and Clear Satellite. (Uncontroverted Fact 15.) That level of informality did not occur in Clear Satellite's relationship with other affiliates. (See Tr. 154–55 (Hreinson) (testifying that Clear Satellite had written contracts with Titan Satellite and other affiliates).) The court therefore finds that the Clear

40

Entities and Goyo did not operate as independent companies; instead, the Clear Entities effectively treated Goyo as a department or subsidiary.

The court also finds that Goyo was undercapitalized during the relevant period.  Mr. McGannon testified that Goyo had negative equity, meaning that its liabilities exceeded its assets, and had negative working capital, meaning that its current liabilities (i.e., liabilities coming due within one year) exceeded its current assets.  (Tr. 289 (McGannon).)  He also asserted that Goyo sustained operating losses each year.  (Id.)  Finally, he compared Goyo to industry statistics that help to show whether a company is undercapitalized.  (Id.)  According to studies by the Risk Management Association, the industry median for the current ratio, which compares a company's current assets to its current liabilities, is about 2.0—in other words, most similar businesses have twice as many current assets as current liabilities.  (Tr. 289–90 (McGannon).)  But Mr. McGannon found that Goyo's current ratio was 0.1, meaning that "if Goyo had $200 in current assets, it would have $2,000 of current liabilities."  (Tr. 290 (McGannon).)

Mr. Southam and Mr. Hreinson made personal contributions to Clear Satellite between 2015 and 2018 but never made any capital contributions to Goyo.  (Tr. 168–69 (Hreinson).)  Mr. Southam and Mr. Hreinson did not take distributions from Goyo during this time, but did take distributions from Clear Satellite and Clear Home.  (Tr. 169–71 (Hreinson); Distributions from Clear Satellite, Ex. 138.)  In 2017, Mr. Southam and Mr. Hreinson each received distributions of $656,722 from Clear Satellite.  (Tr. 171 (Hreinson), 312–14 (Southam).)

## CONCLUSIONS OF LAW

RWS brings claims against Goyo for breach of contract, breach of the implied covenant

of good faith and fair dealing, and account stated.[23]  RWS also asserts that the remaining

Defendants are liable for any damages under an alter ego theory.  Based on its Findings of Fact,

the court considers each of these claims and arguments.

## I.    Breach of Contract

In Utah, a plaintiff bringing a breach of contract claim must establish by a preponderance

of the evidence the following elements: "(1) a contract, (2) performance by the party seeking

recovery, (3) breach of the contract by the other party, and (4) damages."  Bair v. Axiom Design,

L.L.C., 20 P.3d 388, 392 (Utah 2001), abrogated on other grounds by Gillett v. Price, 135 P.3d

861 (Utah 2006).

There is no dispute between the parties that the Agreement was a valid contract and that

RWS performed under that contract by providing leads to Goyo.  Moreover, Goyo admits that it

did not fully perform its obligations under the Agreement.  Mr. Assmus testified that, at the time

the parties were negotiating the Amendment and Partnership Agreement, "there was some

money owed still for sure previous to moving to the rev share and [Goyo] still owed [RWS]

some payouts on the rev share."  (Tr. 383 (Assmus).)  Mr. Assmus cited an outstanding debt of

around $225,000 at the time the parties were negotiating a proposed amendment to settle the

invoice dispute.  (Tr. 384 (Assmus) (stating that his recollection of the debt was around

$225,000).)  While RWS believed that the figure was much higher, Mr. Assmus's testimony

nevertheless establishes that Goyo did not fully perform under the Agreement.  Indeed, Goyo's

---

[23] In its Second Amended Complaint (SAC), RWS asserted these claims against all Defendants.
(See SAC, ECF No. 35 at ¶¶ 63–90.)  But in its pretrial order and at trial, RWS focused its
arguments concerning these claims against Goyo.  (See Proposed Final Pretrial Order, ECF
No. 71 at 1–2.)  Accordingly, the court considers these claims only as they apply to Goyo—after
all, Goyo was the only Defendant who was a party to the Agreement.  At trial, RWS withdrew a
fifth claim for fraudulent transfer against all Defendants.  (See SAC ¶¶ 96–103; Tr. 419–20.)

records indicate that it owed money on multiple invoices.  (See Ex. 143 (showing an outstanding

balance of $225,223); Ex. 146, Tab 3 (showing an outstanding balance of $233,687).)[24]

For these reasons, the court finds that Goyo breached the Agreement.

## A.  Accord and Satisfaction

Rather than arguing that it fully complied with its obligations under the Agreement and

subsequent modifications, Goyo instead asserts the affirmative defense of accord and

satisfaction.  Specifically, Goyo maintains that any outstanding debt under the Agreement was

extinguished because Goyo transferred the Full Concierge website and phone numbers to RWS

and attempted to send RWS a final payment of $29,113 to settle the outstanding installation

accounts under the revenue share model.

An accord is a "contract under which an obligee promises to accept a stated performance

in satisfaction of the obligor's existing duty.  Performance of the accord discharges the original

duty."  Restatement (Second) of Contracts § 281(1) (1981).  The defense has three elements:

"(1) an unliquidated claim or a bona fide dispute over the amount due; (2) a payment offered as

full settlement of the entire dispute; and (3) an acceptance of the payment as full settlement of

the dispute."  Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1013 (10th Cir. 2002) (quoting ProMax

---

[24] This difference between these figures is $8,464, a discrepancy which is due to two errors in
Trial Exhibit 143.  First, the $81,477 figure listed for the bill dated March 29, 2017, is incorrect.
That bill (the February 2017 invoice) was for $81,447 (see Ex. 24 at RWS_00001069) and is
correctly reflected in Trial Exhibit 146.  Second, Trial Exhibit 143 includes a payment for
$8,494.  As discussed above, see supra, Findings of Fact § VI, this payment is not a real
payment, but the surplus left over from Goyo's $39,947 payment on February 21, 2018, after
RWS applied that payment to what it considered older outstanding invoices.  The $8,494 figure
also includes a $2,156 credit for a reduction of the April 2017 invoices from $114,458 to
$112,302.  Goyo's records do not reflect this reduction (see Exs. 143 & 146, Tab 3), but that is
not the only error.  Goyo's records also fail to include any charges for leads generated after April
2017, which includes an invoice of $69,800 for the May 2017 leads and all the invoices during
the revenue share period (totaling $324,487.63).  Finally, Goyo's records fail to reduce the
October 2016, March 2017, and April 2017 lead fees to $75,000.

Dev. Corp. v. Raile, 998 P.2d 254, 259 (Utah 2000)).  The third element "may be satisfied by [either a] subjective intent to discharge an obligation by assenting to the accord, or conduct which gives rise to a reasonable inference that acceptance of the payment discharged the obligation."  Dishinger v. Potter, 47 P.3d 76, 81 (Utah Ct. App. 2001); see also Estate Landscape & Snow Removal Specialists, Inc. v. Mtn. States Tel. & Tel. Co., 844 P.2d 322, 329 (Utah 1992) ("[T]he doctrine does not require subjective intent to discharge an obligation, provided the parties' actions give rise to a reasonable inference that they accepted the altered performance of their contract.").  The party asserting an accord and satisfaction bears the burden of establishing the defense.  See, e.g., In re Unioil, Inc., 962 F.2d 988, 994 (10th Cir. 1992); Messick v. PHD Tracking Serv., 615 P.2d 1276, 1277 (Utah 1980).

It is undisputed that, in April 2018, there was a dispute between the parties involving the amount of the outstanding invoices and that the parties attempted to negotiate a new contract that would have settled this dispute.  During these negotiations, RWS proposed the Addendum, while Goyo proposed both the First Amendment and the Amendment and Partnership Agreement.  It is also undisputed that the parties never signed any of these proposals.

Nevertheless, Goyo maintains that the terms of the proposed accord were sufficiently clear, and that Goyo satisfied those terms.  Goyo points to the Amendment, which stated that RWS would "waive its claim to alleged past-due Lead fees" provided that 1) Goyo made a final payment to RWS of $29,113 "to cover services rendered under the orally revised revenue model"; and 2) Goyo transferred the telephone numbers and Full Concierge website to RWS.[25]

---

[25] Goyo also suggests that the proposed accord included a covenant not to compete.  The court finds that this condition was only specified in the first proposal that RWS sent to Goyo, the Addendum, and that it was not reflected in later drafts traded between the parties.  The inclusion of such a covenant is not material, as RWS has not argued that Goyo violated any agreement not to compete during the months between the parties' negotiations and when Goyo dissolved.

(Ex. 60 at GOYO006742–43.)

The court agrees that Goyo did attempt to make the $29,113 payment and did transfer the telephone numbers and website, although there is some uncertainty about when the website transfer occurred.  RWS argues that the website transfer must have occurred after it issued the Demand Letter, which offered to lower Goyo's outstanding debt by $50,000 in exchange for the website.  RWS therefore maintains that Goyo transferred the website in response to the Demand Letter, and not because the parties had reached any meeting of the minds to extinguish Goyo's debt in exchange for the website.

Although the court agrees with RWS that the transfer most likely occurred after the Demand Letter, this point is not dispositive because Goyo's defense fails for a much more important reason.  Namely, Goyo overlooks a critical aspect of the negotiations between the parties: Mr. Thornberry's desire to develop a contractual relationship between RWS and the Clear Entities.  This relationship was a sticking point in the proposals the parties traded back and forth.  The Addendum drafted by RWS proposed to amend the parties to the original Agreement to include Clear Satellite, who would then be on the hook for any future payments.  (Ex. 53 at GOYO017590.)  In contrast, the First Amendment drafted by Goyo "excluded Clear Satellite's name from the agreement …." (Ex. 56.)  This proposal was unacceptable to Mr. Thornberry, who testified that he was not going to sign any amendment to the Agreement that did not include the Clear Entities.  (Tr. 71 (Thornberry).)  Accordingly, Goyo drafted another Amendment and emailed that proposal along with a Partnership Agreement laying out the terms of an ongoing relationship between RWS and Clear Home.  (Ex. 60.)

Although the Amendment did not directly state that RWS would only waive Goyo's outstanding debt upon signing the Partnership Agreement, this condition was implied.  Goyo sent

the two documents in the same email, and the documents are intertwined in other ways. For instance, the Partnership Agreement required Clear Home to pay RWS for 32 preexisting accounts, which were holdovers from the revenue share period with Goyo. (Ex. 60 at GOYO006760.) At the very least, Goyo would need to adjust the final payment figure of $29,113 to account for these pending accounts if the parties determined that they would not go forward with the Partnership Agreement. (See Ex. 59 at GOYO017159–60 (email from Mr. Assmus to Mr. Thornberry stating that "34 pending jobs" would either need to be added to the $29,113 total or "preferably" rolled into a new "Clear Home Partner Agreement").) The documents were therefore related and both reflected essential components of the parties' negotiations: the Amendment purported to terminate Goyo's relationship with RWS, whereas the Partnership Agreement purported to create a relationship between RWS and Clear Home. The court finds that Mr. Thornberry was not going to sign one without the other.

Indeed, Mr. Assmus explained the full terms of the proposed agreement to waive Goyo's outstanding debt when he described the negotiations between the parties as follows:

> [The proposal] was basically to terminate the old deal, spin up a new deal, so that way—[Mr. Thornberry] had some other stuff he was working on and he didn't really disclose to me what it was. He just made it seem like there was a really big opportunity to maximize bounty and not just a rev share bounty.
>
> Essentially we would terminate everything with Goyo, give him the phone numbers, give him the website and not compete against him with like his inspector groups and stuff like that, and then pay him his last payment that we owed him on the rev share. Then everything going forward would be an agreement directly with Clear.

(Tr. 385 (Assmus) (emphasis added).) Mr. Southam agreed with this characterization when he explained that the new agreement was going to "create Nathan as his own affiliate …." (Tr. 224 (Southam).)

It is undisputed that RWS and Clear Home did not sign the Partnership Agreement or

otherwise enter into a business relationship together.  Without this ongoing partnership, the court

finds that there was no meeting of the minds to extinguish Goyo's outstanding debt under the

Agreement.  Accordingly, Goyo has failed to demonstrate that RWS accepted the payment Goyo

offered—$29,113 plus the telephone numbers and website—as a full settlement of the dispute.

Goyo is therefore liable for its breach of the Agreement.

### B.  Oral Modifications to the Agreement

Having determined that Goyo breached its contract with RWS, and that Goyo's duties

were not extinguished by any accord and satisfaction, the court must now determine the terms of

the contract that Goyo breached.

Although the Agreement between RWS and Goyo specified that any changes must be in

writing, the parties agreed that they were "bobbing and weaving" as they tried to "figure this

thing out" (Tr. 232 (Southam)), and the court finds that the parties made several oral

modifications to the Agreement.  Such modifications are enforceable under Utah law:

> In Utah, parties to a written agreement may not only enter into separate,
> subsequent agreements, but they may also modify a written agreement through
> verbal negotiations subsequent to entering into the initial written agreement, even
> if the agreement being modified unambiguously indicates that any modifications
> must be in writing.

R.T. Nielson Co. v. Cook, 40 P.3d 1119, 1124 n.4 (Utah 2002); see also Prince v. R.C. Tolman

Const. Co., Inc., 610 P.2d 1267, 1269 (Utah 1980) ("[N]otwithstanding recitals in a prior

contract restricting changes or modification in its terms, the parties are as free in appropriate

circumstances to renegotiate new terms or to make separate supplemental agreements as they

were to make the contract in the first place.").  When such an oral modification has been made,

the modified terms "govern the rights and obligations of the parties under the contract, and any

pre-modification contractual rights which conflict with the terms of the contract as modified

47

must be deemed waived or excused." Rapp v. Mtn. States Tel. & Tel. Co., 606 P.2d 1189, 1191 (Utah 1980).

The court finds that the parties made three oral modifications to the original Agreement and that RWS waived its right to demand payment in excess of these modifications. First, the parties agreed to a mixed lead fees model, in which RWS would charge $17 for some leads and $7 for other leads. This arrangement was not purely a gratuitous reduction in price provided by RWS, as the mixed leads came with certain restrictions—such as the number of calls that Goyo could make on a shared lead. While it is unclear exactly when the parties switched from the terms of the original Agreement to the mixed lead fees model, there is no dispute that Goyo owes only $10,000, a marketing fee for January 2016, from this period.[26]

The parties dispute the contours of the second modification, but there is ample evidence to support the court's finding that the parties agreed to cap lead fees at $75,000. Mr. Southam, Mr. Christiansen, Mr. Assmus, and—most importantly—Mr. Thornberry all testified that the parties had an "expectation" that fees would be capped at $75,000. (Tr. 101 (Thornberry).) Mr. Thornberry even provided an example of one such waiver, which he believed "was $86,000 down to $75,000." (Tr. 55 (Thornberry).) Moreover, emails between the parties reflect that Mr. Christiansen objected to invoices that were above $75,000 and that Mr. Assmus operated under the assumption that there was a $75,000 cap. (Ex. 17.) Although Goyo made only a partial payment of $50,000 on the December 2016 invoice and stopped paying invoices for the remainder of the capped fees period, no evidence suggests that the parties renegotiated this arrangement or ended the capped fees until RWS began billing under the revenue share model. The court therefore finds that the parties operated under the capped fees modification from

---

[26] See supra, Findings of Fact § VI, Table 4.

June 1, 2016, until May 31, 2017.

Finally, the court finds that the parties began billing under a revenue share model on June 1, 2017.  This modification became the model for the remainder of the parties' relationship. The later invoices at issue in this litigation all reflect this arrangement, in which RWS received a commission when one of its leads resulted in either an alarm or DirecTV installation.  Although the parties used different accounting methods to calculate the amounts owed during this period, their numbers generally agree for the first several months.  To the extent those numbers differ as the revenue share period continued, the court relies on RWS's invoices.  Those invoices reflect lower charges and are based on sales and installation data that Goyo provided and, in any event, Goyo has not made specific objections to any of these charges.

### C.  Damages

Having determined the terms of the Agreement and its subsequent modifications, it is relatively straightforward to calculate the damages owed by Goyo for its breach of contract. Table 9 includes the amounts charged by RWS, the amounts allowed by the court under the Agreement and its modifications, the amounts paid by Goyo, and the court's determination of the remaining amounts owed.

**Table 9: Allowed Amounts**

| Period | Charged (RWS) | Allowed (Court) | Paid (Goyo) | Owed |
|---|---|---|---|---|
| **Agreement and First Modification: Mixed Lead Fees** | | | | |
| Oct-15 | $75,658.00 | $75,658.00 | $75,658.00 | $0.00 |
| Nov-15 | $81,196.00 | $81,196.00 | $81,196.00 | $0.00 |
| Dec-15 | $84,154.00 | $84,154.00 | $84,154.00 | $0.00 |
| Jan-16 | $70,401.00 | $70,401.00 | $60,401.00 | $10,000.00 |
| Feb-16 | $108,396.00 | $108,396.00 | $108,396.00 | $0.00 |
| Mar-16 | $139,066.00 | $139,066.00 | $139,066.00 | $0.00 |
| Apr-16 | $135,388.00 | $135,388.00 | $135,388.00 | $0.00 |
| May-16 | $152,683.00 | $152,683.00 | $152,683.00 | $0.00 |

| Period | Charged (RWS) | Allowed (Court) | Paid (Goyo) | Owed |
|---|---|---|---|---|
| Second Modification: $75,000 Capped Fees | | | | |
| Jun-16 | $90,059.00 | $75,000.00 | $75,000.00 | $0.00 |
| Jul-16 | $97,091.00 | $75,000.00 | $75,000.00 | $0.00 |
| Aug-16 | $95,234.00 | $75,000.00 | $75,000.00 | $0.00 |
| Sep-16 | $66,494.00 | $66,494.00 | $66,494.00 | $0.00 |
| Oct-16 | $80,279.00 | $75,000.00 | $80,239.00 | -$5,239.00 |
| Nov-16 | $81,692.00 | $75,000.00 | $75,000.00 | $0.00 |
| Dec-16 | $62,377.00 | $62,377.00 | $50,000.00 | $12,377.00 |
| Jan-17 | $60,501.00 | $60,501.00 | $0.00 | $60,501.00 |
| Feb-17 | $81,447.00 | $75,000.00 | $0.00 | $75,000.00 |
| Mar-17 | $115,405.00 | $75,000.00 | $0.00 | $75,000.00 |
| Apr-17 | $112,302.00 | $75,000.00 | $0.00 | $75,000.00 |
| May-17 | $69,800.00 | $69,800.00 | $0.00 | $69,800.00 |
| Third Modification: Revenue Share Model | | | | |
| Jun-17 | $26,486.00 | $26,486.00 | $26,486.00 | $0.00 |
| Jul-17 | $16,728.00 | $16,728.00 | $16,728.00 | $0.00 |
| Aug-17 | $20,659.00 | $20,659.00 | $20,659.00 | $0.00 |
| Sep-17 | $15,912.00 | $15,912.00 | $15,912.00 | $0.00 |
| Oct-17 | $11,696.00 | $11,696.00 | $11,696.00 | $0.00 |
| Nov-17 | $16,876.00 | $16,876.00 | $16,876.00 | $0.00 |
| Dec-17 | $13,504.00 | $13,504.00 | $13,504.00 | $0.00 |
| Jan-18 | $15,356.72 | $15,356.72 | $15,356.72 | $0.00 |
| Feb-18 | $16,443.92 | $16,443.92 | $16,443.92 | $0.00 |
| Mar-18 | $20,520.93 | $20,520.93 | $6,879.36 | $13,641.57 |
| Apr-18 | $5,436.00 | $5,436.00 | $0.00 | $5,436.00 |
| May-18 | $11,007.90 | $11,007.90 | $0.00 | $11,007.90 |
| Jun-18 | $29,082.66 | $29,082.66 | $0.00 | $29,082.66 |
| Jul-18 | $0.00 | $0.00 | $0.00 | $0.00 |
| Aug-18 | $77,462.55 | $77,462.55 | $0.00 | $77,462.55 |
| Sep-18 | $27,315.95 | $27,315.95 | $0.00 | $27,315.95 |
| TOTAL: | $2,184,110.63 | $2,030,601.63 | $1,494,216.00 | $536,385.63 |

The court has capped all invoices at $75,000 for the leads provided from June 2016 to May 2017. The court has also included a small credit for the October 16 invoice, which Goyo overpaid. Finally, the court has applied the payments made by Goyo during the revenue share period (totaling $160,541) to the revenue share invoices provided by RWS, resulting in full

payments on the invoices from June 2017 through February 2018, a partial payment on the March 2018 invoice, and no payments thereafter.

The court notes that, according to RWS's accounting, Goyo owes $2,184,111 and has paid $1,494,216. Therefore, according to RWS, Goyo still owes $689,895. This figure is $2,156 higher than RWS's requested damages of $687,739. As discussed above, the court finds that discrepancy is due to a double credit RWS gave Goyo after lowering the April 2017 invoice by $2,156 because 1) RWS included that adjustment as part of Goyo's $8,494 "payment" credited towards the February 2017 invoice; and 2) RWS nevertheless used the lower amount for the April 2017 invoice when making its damages calculations. Besides this discrepancy—and the court's adjustments for the capped fees period, which lowers RWS's requested amount by $153,509—, the court's figures are consistent RWS's accounting and its requested damages.

### D. Adjustment of Amount Owed

Although the court finds that Goyo owes RWS $536,386 under the Agreement and its subsequent modifications, the court makes a downward adjustment of approximately $60,000 to this amount and awards RWS $475,000.

That downward adjustment is appropriate for several reasons. Most importantly, the court finds that RWS benefitted from the website and phone numbers. Indeed, RWS valued the website alone to be worth $50,000, as the Demand Letter contained an offer to reduce Goyo's outstanding debt by that amount if Goyo transferred full ownership and rights to the website. (Ex. 69.) The development of a one-stop services database was a motivating reason for RWS to team up with Goyo and Mr. Thornberry admitted that "Paul Southam and his team launched" the Full Concierge program. (Tr. 35 (Thornberry).) Mr. Christiansen testified that Goyo developed and designed the Full Concierge website. (Tr. 324 (Christiansen).) He estimated the value of

goodwill in the phone numbers and the website at "a couple hundred thousand dollars." (Tr. 338 (Christiansen).) Mr. Southam testified that he spent "hundreds of thousands" of dollars developing these assets. (Tr. 226 (Southam).)

The court finds that Mr. Christiansen's testimony is speculative, and the Defendants did not present testimony from a valuation expert to provide a more substantiated estimate. But the website and phone numbers clearly had value to RWS, and the record supports assigning a value of $50,000 for the website and a nominal value of $10,000 for the phone numbers.

Additionally, the court notes that it has awarded RWS $60,501 (approximately the same amount as the downward adjustment the court makes) for Goyo's failure to pay the January 2017 invoice—even though RWS did not submit that invoice into the record.[27] This gap in the evidentiary record is not fatal because the court may exercise its equitable power to look at the case holistically and compare the total amount owed under the Agreement and its modifications to the total amount that Goyo paid. But to the extent that the court relies on those equitable powers, it also finds it appropriate to account for any unjust enrichment that RWS may have received from taking control of the phone numbers and website without applying the offered discount to Goyo's outstanding debt.

After making the appropriate downward adjustment, the court rounds its judgment to the nearest $5,000[28] and awards RWS $475,000 for Goyo's breach of contract.

---

[27] Although the court does not make a finding that RWS acted in bad faith by failing to provide a full record of invoices, Mr. Thornberry's testimony was clear that, during the capped fees period, RWS waived fees over $75,000 "a few times" (Tr. 101 (Thornberry)), including one adjustment of approximately $11,000. (Tr. 55 (Thornberry).) Yet despite Mr. Thornberry's testimony, RWS has presented no evidence that it ever waived these fees. Instead, the record suggests that RWS was trying to walk back these waivers while hoping that nobody noticed.

[28] Rounding results in a slight additional downward adjustment. The court notes that Mr. McGannon would have adjusted RWS's invoices downward by about $2,000 to account for various discrepancies he found in the invoices. (See Summary of RWS's Outstanding Invoices,

## II.    Breach of the Covenant of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing inheres in most, if not all, contractual relationships.  See Beck v. Farmers Ins. Exch., 701 P.2d 795, 798 (Utah 1985).  The covenant reflects the duty of good faith between contracting parties, who each "impliedly promises that he or she will not intentionally or purposely do anything to destroy or injure the other party's right to receive the fruits of the contract." A.I. Transport v. Imperial Premium Fin., Inc., 862 F. Supp. 345, 348 (D. Utah 1994) (citing Bastian v. Cedar Hills Inv. & Land Co., 632 P.2d 818, 821 (Utah 1981)).  "When a claim for breach of contract is pleaded separately from a claim for breach of the implied covenant[,] … one plausible way to interpret the pleading is to construe the breach of contract claim as seeking relief for breaches of express terms of the contract, and to construe the claim for breach of the implied covenant as seeking relief for breaches of that particular implied provision." Olé Mexican Foods Inc. v. J & W Distribution LLC, 549 P.3d 663, 673 (Utah Ct. App. 2024).

Because the court finds that Goyo breached the express terms of both the Agreement and the parties' oral modifications to that Agreement by failing to pay all amounts owed on outstanding invoices, the court does not need to consider whether Goyo also breached the implied covenant of good faith and fair dealing.

## III.    Account Stated

Similarly, the court only briefly addresses RWS's claim for account stated, which is an agreement that a specific amount is owed for a prior transaction.  See Hurd v. Cent. Utah Water Co., 106 P.2d 775, 777–78 (Utah 1940).  An account stated is a different way of framing a

---

Ex. 92.)  The court's rounded figure for damages takes into account these minor discrepancies and reflects a comprehensive assessment of the evidence presented.

breach of contract claim in which the plaintiff must show that "the parties to a contractual relationship [have formed] a new and separate binding agreement about the correctness of the amount due." Dale K. Barker Co., P.C. v. Valley Plaza, 541 F. App'x 810, 814 (10th Cir. 2013).

The court finds that Goyo and RWS never agreed about the correct amount that was due under the Agreement and its modifications. Although there is no evidence that the Defendants ever disputed the invoices submitted to the court (see, e.g., Tr. 208 (Southam) (testifying that he did not dispute the invoices attached to the Demand Letter)), the record does reflect that Goyo disputed invoices during the capped fees period. (See Ex. 17 (email from Mr. Christiansen to Mr. Thornberry stating: "I thought we agreed that our bill would max out at 75k per month to help us break even???").) Indeed, this dispute over the correct amount of Goyo's outstanding balance was the crux of the parties' disagreement and the source of this litigation.

The court has therefore decided RWS's claim under a breach of contract framework, rather than under a theory of account stated.

## IV.  Alter Ego Liability

Having found that Goyo is liable to RWS in the amount of $475,000, the court must determine whether any of the remaining Defendants are also liable for this amount under an alter ego theory.

An alter ego claim is a theory of liability, not an independent claim for relief. Jones & Trevor Mktg., Inc. v. Lowry, 284 P.3d 630, 634 n.1 (Utah 2012), overruled in part on other grounds by Salo v. Tyler, 417 P.3d 581 (2018). "Ordinarily, a corporation is regarded as a separate and distinct legal entity from its stockholders." Dockstader v. Walker, 510 P.2d 528 (1973). This separation "insulate[s] the stockholders from the liabilities of the corporation, thus limiting their liability to only the amount that the stockholders voluntarily put at risk." Salt Lake

City Corp. v. James Constructors, Inc., 761 P.2d 42, 56 (Utah Ct. App. 1988) (citation omitted).

The alter ego doctrine is an exception to this general rule.  See Jones & Trevor Mktg., 284 P.3d

at 635.  "If a party can prove its alter ego theory, then that party may 'pierce the corporate veil'

and obtain a judgment against the individual shareholder even when the original cause of action

arose from a dispute with the corporate entity."  Id. (citation omitted).

Under Utah law, RWS must demonstrate two elements to succeed on an alter ego theory.

First, "there must be "such unity of interest and ownership that the separate personalities of the

corporation no longer exist …."  Norman v. Murray First Thrift & Loan Co., 596 P.2d 1028,

1030 (Utah 1979).  In other words, "the corporation is, in fact, the alter ego of one or a few

individuals …."  Id.  Second, RWS must show that "the observance of the corporate form would

sanction a fraud, promote injustice, or an inequitable result would follow."  Id.  The first element

is known as the "formalities requirement," while the second element is called the "fairness

requirement" and is addressed to the "conscious of the court."  James Constructors, 761 P.2d

at 47.

The Utah Court of Appeals has articulated eight factors that courts should consider when

evaluating claims predicated on a theory of alter ego liability:

> (1) undercapitalization of a one-man corporation; (2) failure to observe corporate
> formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the
> dominant shareholder; (5) nonfunctioning of other officers or directors; (6)
> absence of corporate records; (7) the use of the corporation as a façade for
> operations of the dominant stockholder or stockholders; and (8) the use of the
> corporate entity in promoting injustice or fraud.

Colman v. Colman, 743 P.2d 782, 786 (Utah Ct. App. 1987).  The Utah Supreme Court has since

adopted the Colman factors "with the caveat that they are … only non-exclusive considerations."

Jones & Trevor Mktg., 284 P.3d at 637.  The Utah Supreme Court has also clarified that "the

first seven Colman factors relate to the formalities element of the alter ego test, while the eighth

55

Colman factor is merely a restatement of the fairness element." Id.

Although much of Utah law explaining the alter ego doctrine has been developed in the context of a corporation and its shareholders, Utah courts have extended the doctrine to a parent corporation and its subsidiary. See, e.g., James Constructors, 761 P.2d at 47. "In the parent-subsidiary situation, the central focus of the formalities prong is 'the degree of control that the parent exercises over the subsidiary and the extent to which the corporate formalities are observed." Id. (citation omitted). Favorably citing to a case from the United States District Court for the District of Minnesota, the Utah Court of Appeals noted "eleven factors relevant to deciding whether the parent exercises 'the necessary control' over its subsidiary." Id. (citing United States v. Advance Mach. Co., 547 F. Supp. 1085, 1093 (D. Minn. 1982)). Those factors are:

(a) The parent corporation owns all or most of the capital stock of the subsidiary;

(b) The parent and subsidiary corporations have common directors and officers;

(c) The parent corporation finances the subsidiary;

(d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation;

(e) The subsidiary has grossly inadequate capital;

(f) The parent corporation pays the salaries and other expenses or losses of the subsidiary;

(g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;

(h) In the papers of the parent corporation or in the statement of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own;

(i) The parent corporation uses the property of the subsidiary as its own;

(j) The directors or executives of the subsidiary do not act independently in the

interest of the subsidiary but take their orders from the parent corporation in the latter's interest;

(k) The formal legal requirements of the subsidiary are not observed.

Advance Mach. Co., 547 F. Supp. at 1093 (citing C M Corp. v. Oberer Dev. Co., 631 F.2d 536, 539 (7th Cir. 1980)).

The court finds that the factors that Utah courts have considered in the parent-subsidiary context are also helpful when applying an alter ego analysis to closely related companies, even where the second company has not been formally created as a subsidiary of the first. Other courts have extended the alter ego doctrine in this context. For instance, applying Texas law, the Fifth Circuit has imposed liability on one company for the acts of a second company when the second company is "organized or operated as a mere tool or business conduit." Gardemal v. Westin Hotel Co., 186 F.3d 588, 593 (5th Cir. 1999). In that circumstance, the alter ego doctrine applies when there is "such unity" between the two companies that the "separateness of the two [companies] has ceased" and holding only one company liable would "result in injustice." Id. To demonstrate alter ego, the plaintiff must produce "evidence showing a blending of identities, or a blurring of lines of distinction" between the two companies. Id. Finally, the court notes that it has found no law—nor have the Defendants cited any precedent—limiting the application of the alter ego doctrine to companies that have been incorporated, rather than those that have been organized as limited liability companies. See White Family Harmony Inv., Ltd. v. Transwestern West Valley, LLC, No. 2:05-cv-495-DAK, 2007 WL 2821798, at *12 (D. Utah Sept. 27, 2007) ("Corporations cannot escape contractual liabilities merely because they are set up as limited liability corporations.").

"Courts must balance piercing and insulating policies and will only reluctantly and

cautiously pierce the corporate veil." <u>James Constructors</u>, 761 P.2d at 47.  Moreover, "[c]ourts

have been extraordinarily reluctant to lift the veil in contract cases … where the 'creditor has

willingly transacted business' with the corporation." <u>D'Elia v. Rice Dev. Inc.</u>, 147 P.3d 515, 522

(Utah Ct. App. 2006) (citation omitted).  Accordingly, "[a] party alleging liability based on an

alter ego theory bears the burden of proof on that theory at trial." <u>Jones & Trevor Mktg.</u>, 284

P.3d at 639.

But "[a] key feature of the alter ego theory is that it is an equitable doctrine requiring that

each case be determined upon its peculiar facts." <u>James Constructors</u>, 761 P.2d at 47.  And here,

despite the court's general reluctance to pierce the corporate veil, the court finds that RWS has

carried it burden to demonstrate that the Clear Entities should be held liable as Goyo's alter egos.

### A.  Formalities Requirement

The court finds that Goyo and the Clear Entities had such a unity of interest and

ownership that the formalities prong is satisfied.  Mr. Hreinson and Mr. Southam, who co-owned

both Goyo and Clear Satellite throughout the majority of the time when Goyo and RWS were

working together, treated Goyo as a department or subsidiary of Clear Satellite and later Clear

Home, exercising control over Goyo and deciding whether and when Goyo would pay its

expenses.

The court is not persuaded by Goyo's assertion that there were important differences in

the ownership and control of the companies.  Although Goyo initially had different owners (<u>see</u>

Tr. 233 (Southam)), Goyo was owned solely by Mr. Hreinson and Mr. Southam from before

Goyo executed the Agreement with RWS until Goyo's dissolution.  (Uncontroverted Facts 5, 8–

9.)  At the same time, Mr. Hreinson and Mr. Southam—having bought out a third partner—were

the sole owners of Clear Satellite from 2015 until the formation of Clear Home in 2017.

(Uncontroverted Fact 17, Tr. 148 (Hreinson).)  And even though Clear Home initially had nine owners after the merger of Clear Satellite and Now Communications, Mr. Hreinson and Mr. Southam continued to have a substantial ownership interest in that company, eventually owning 92% of Clear Home between the two of them.  (Uncontroverted Fact 23; Tr. 173 (Hreinson).) Moreover, Mr. Southam was the CEO of both Clear Satellite and Clear Home and Mr. Hreinson was the President of those two companies.  (Uncontroverted Facts 16, 22.)  Meanwhile, Mr. Southam was the president of Goyo.  (Tr. 190–91 (Southam).)  Finally, many executives at Goyo later worked for the Clear Entities.  For instance, after serving as Goyo's acting president, Mr. Christiansen became the president of sales and then president of Clear Solar, before becoming the chief revenue officer of Clear Home.  (Uncontroverted Fact 6.)  And Mr. Assmus became the vice president of sales at Clear Home after he was a Goyo manager.  (Uncontroverted Fact 7.) The court therefore finds that there was significant overlap between the companies' ownership and control.

Moreover, Goyo was capitalized by first Clear Satellite and then Clear Home.  Rather than—or in addition to[29]—sending Goyo money on a regular basis for services rendered, the Clear Entities frequently sent Goyo money as Goyo needed those funds to pay other bills.  The Clear Entities treated the money transfers as intracompany loans, not intercompany loans—there were no loan documents, interest payments, prepayment penalties, or anything to signify that these transfers were loans from companies engaged in an arm's-length relationship rather than transfers between departments at the same company.

These transfers, often arriving in Goyo's bank account on the same day that Goyo made

---

[29] See supra, Findings of Fact § VII.  The Defendants did not provide adequate evidence to explain how the Clear Entities paid Goyo for its DirecTV installations or other business.

payments, were necessary for Goyo to cover its expenses, as Goyo was grossly undercapitalized. In <u>James Constructors</u>, the Utah Court of Appeals noted that "shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is ground for denying the separate entity privilege." 761 P.2d at 47 n.10 (citation omitted). But Goyo was never sufficiently capitalized and could not have paid the salaries of its employees or other expenses without the transfers from the Clear Entities. The court finds that Mr. McGannon was a reliable and persuasive witness, and Mr. McGannon provided several examples of Goyo's undercapitalization and its inability to pay its expenses unless it received a transfer from the Clear Entities. (Tr. 283–85 (McGannon).) Mr. McGannon also testified that Goyo sustained operating losses each year, that Goyo had negative equity, that Goyo had negative working capital, and that Goyo's financial ratios related to capitalization were well below industry benchmarks for companies in a comparable industry. (Tr. 289–90 (McGannon).)

Goyo had virtually no assets except those that were conveyed to it by the Clear Entities. Approximately 92.2% of Goyo's incoming funds came from the Clear Entities (Uncontroverted Fact 56), demonstrating that Goyo had substantially no business except with the Clear Entities. Goyo also kept no corporate records, such as an operating agreement or minutes from meetings of Goyo's members. (<u>See, e.g.</u>, Tr. 209 (Southam) (admitting that Goyo had no operating agreement).)

Most importantly, the Clear Entities exercised a large degree of control over Goyo. As president of Goyo, Mr. Southam authorized payment for invoices from service providers such as RWS. (Uncontroverted Fact 49.) Emails between officers at Goyo and employees at Clear Home demonstrate that Clear Home helped Goyo process payments sent to RWS. (<u>See, e.g.</u>,

Ex. 33 (email from Mr. Assmus asking a Clear Home employee not to fund a payment for RWS yet); Ex. 57 (email from Clear Home employee asking when to process payment for March and April 2018 leads that RWS provided to Goyo).)  Accordingly, while Goyo's day-to-day management may have been run by other directors, Goyo's overall decisions about its finances came from Mr. Southam and the Clear Entities.

Moreover, it was Mr. Southam who executed the Agreement with RWS in 2015, thereby establishing the parameters under which Goyo operated during the relevant period.  And even before the relationship with RWS, Mr. Southam and Mr. Hreinson had created Goyo so they could make deals with other satellite providers without running afoul of Clear Satellite's exclusive contract with DirecTV.  (Uncontroverted Fact 13.)  The Clear Entities financed Goyo through decisions by Mr. Southam, who cited "my 2 million" in losses[30] when Goyo did not become profitable.  (Ex. 43 at GOYO028814.)  Finally, the parties presented no evidence that anyone besides Mr. Southam and Mr. Hreinson made the decision to cease funding Goyo through Clear Home and dissolve the company.  And when Goyo shut down, Mr. Southam authorized Clear Home's controller to request that Chase Bank close Goyo's accounts and transfer the balances to Clear Home's operating account.  (Uncontroverted Fact 59.)  The record therefore shows that the Clear Entities, through Mr. Hreinson and especially Mr. Southam, created Goyo, financed Goyo, and dissolved Goyo.  And the Clear Entities were the final decisionmakers about whether and when Goyo would receive cash transfers that would allow Goyo to pay its bills.

Looking at the applicable factors, the court finds that 1) Goyo and the Clear Entities had

---

[30] These losses were primarily losses from the perspective of the Clear Entities.  Although both Mr. Southam and Mr. Hreinson made personal contributions to Clear Satellite, they did not make any capital contributions to Goyo.  (Tr. 168–69 (Hreinson).)

common directors and officers; 2) the Clear Entities financed Goyo; 3) Goyo had grossly

inadequate capital; 4) the Clear Entities effectively paid Goyo's expenses; 5) Goyo had few

assets except those conveyed to it by the Clear Entities; 6) Goyo took its orders on financing

decisions from Mr. Southam and the Clear Entities; and 7) Goyo did not maintain appropriate

documents to show that cash transfers from the Clear Entities were loans or to otherwise

demonstrate an arm's-length business relationship with the Clear Entities.  The court therefore

finds that the applicable factors that Utah courts have considered in the parent-subsidiary context

all weigh in favor of finding that Goyo and the Clear Entities had a unity of ownership and

interest sufficient to satisfy the formalities requirement.

## B.  Fairness Requirement

Although the court finds that there was a unity of interest between Goyo and the Clear

Entities, the fact that RWS may have difficulty enforcing a judgment against Goyo alone "is not

the type of injustice that warrants piercing the corporate veil.  Lowell Staats Min. Co. v. Pioneer

Uravan, Inc., 878 F.2d 1259, 1265 (10th Cir. 1989).  Instead, "the 'injustice' or 'inequity' to the

claimant must be connected with the lack of separateness … and the failure to observe corporate

formalities."  Cascade Energy & Metals Corp. v. Banks, 896 F.2d 1557, 1578 (10th Cir. 1990).

RWS does not need to show that Goyo or the Clear Entities committed actual fraud, only that a

failure to pierce the corporate veil would result in an injustice.  Colman, 743 P.2d at 786; White

Family Harmony Inv., 2007 WL 2821798, at *13.

Although court finds that RWS has satisfied the fairness prong because the Clear Entities not

only controlled Goyo but decided when and whether Goyo would pay its bills and when it would

cease its operations.  Having financed Goyo for several years, and finding it was a losing

proposition, its owners decided to shut down the company—even though Goyo had not resolved

a dispute with RWS about outstanding invoices that even Goyo admitted amounted to over $225,000 (and, as the court has determined, amounted to over twice that figure).

The court finds that the facts are analogous to another case from this court in which the Honorable Dale Kimball determined that it was appropriate to pierce the corporate veil where the parent company not only "played a role" in the breach of a lease agreement between the company it had created (Transwestern West Valley) and a third party (WFHI), but where the parent company was "the primary cause of the breach and the party responsible for Transwestern West Valley's inability to make WFHI whole." White Family Harmony Inv., 2007 WL 2821798, at *13.

Here, Goyo paid its invoices to RWS when authorized by Mr. Southam and Clear Satellite. By the time Clear Satellite became Clear Home, the parties were engaged in negotiations to settle the outstanding debt that Goyo owed RWS. And the court has found that those negotiations foundered on the parties' inability to agree on a continuing relationship between RWS and Clear Home. After the parties were unable to reach an agreement, Clear Home did not authorize any future payments to RWS to resolve the dispute, other than to send the $29,113 check for amounts owed under the revenue share arrangement. Instead, Clear Home closed Goyo's accounts and transferred the balances in those accounts to Clear Home's operating account. Based on these facts, the court finds that the Clear Entities were the primary cause of Goyo's breach and the parties responsible for Goyo's inability to make RWS whole.

Were the court to hold otherwise, it would sanction an inequitable result. The record shows that Goyo was a useful affiliate for the Clear Entities because Goyo could make deals with satellite companies besides DirecTV. But the record also shows that it was unclear whether Goyo would ever be profitable and that Goyo rarely had significant capital in its operating

account.  By funding Goyo as needed, the Clear Entities could walk away from Goyo's debts at any point those companies determined that continued funding was a losing battle—a choice that the Clear Entities eventually made after negotiations with RWS failed to produce new contracts on which the parties could agree.  The court declines to allow a company to manage its risk by creating a separate limited liability company that is controlled by the same owners and that can shutter its doors at any point to avoid paying its debts.

For these reasons, RWS has established both the formalities prong and the fairness prong of the alter ego analysis.  The court therefore finds that the Clear Entities are liable for the damages caused by Goyo's breach of contract.

### C.  Mr. Southam and Mr. Hreinson

Although the court finds that it is appropriate to pierce the corporate veil to hold the Clear Entities liable for amounts owed by Goyo, the record provides insufficient evidence to mandate the same result for the individual Defendants.  Even though Mr. Southam and Mr. Hreinson made decisions for the Clear Entities and Goyo, there is little evidence that the Clear Entities themselves operated as pass-through entities or otherwise failed to comply with corporate formalities.  At most, RWS points to personal distributions of $656,722 that Mr. Southam and Mr. Hreinson received from Clear Satellite in 2017.  (Ex. 138; Tr. 171 (Hreinson), 312–14 (Southam).)  But these distributions merely show that Clear Satellite could have transferred more money to Goyo to help pay Goyo's debts, not that this compensation was otherwise fraudulent or inappropriate given the overall business conducted by Clear Satellite.

If Goyo had in fact been a department of Clear Satellite and later Clear Home, RWS could simply seek judgment from the Clear Entities—there would be no need to pierce the corporate veil to hold Mr. Southam and Mr. Hreinson personally liable.  The way in which Mr.

Southam and Mr. Hreinson controlled the Clear Entities is not what has promoted an inequitable result here; instead, it is the way in which the Clear Entities controlled Goyo as a subsidiary and eventually chose to dissolve Goyo rather than to honor Goyo's debts. The court therefore finds that the Clear Entities were alter egos of Goyo but does not find that Mr. Southam and Mr. Hreinson were alter egos of either Goyo or the Clear Entities.

## V. Pre-Judgment Interest

The court dates Goyo's breach of contract to October 15, 2018. This was the date on which the final invoice issued by RWS was due. (See September 2018 Invoice, Ex. 24 at RWS_00001087–92; Ex. 6 at 7 (stating that Goyo must submit payment to RWS by the fifteenth of every calendar month).) Although RWS previously sent the Demand Letter to Goyo on July 3, 2018 (see Ex. 69), the court finds that the parties had an ongoing relationship until the date of RWS's final invoices and Goyo's dissolution. The court therefore holds that October 15, 2018, is the most appropriate date from which to calculate prejudgment interest.

Applying simple interest at 10% per annum to the judgment of $475,000 from October 15, 2018, to the date of this order, the court awards RWS $306,993 in prejudgment interest. The court therefore awards RWS $781,993.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      The court finds that Goyo breached its contract with RWS.

2.      The court finds that Clear Satellite and Clear Home are liable for the damages from Goyo's breach of contract under an alter ego theory of liability.

3.      The court finds that Mr. Southam and Mr. Hreinson are not personally liable for the damages from Goyo's breach of contract under an alter ego theory of liability.

4.     The court dismisses the RWS's causes of action for breach of the implied covenant of good faith and fair dealing and for account stated as moot.

5.     The court awards RWS $781,993, an amount that includes $475,000 for the damages from Goyo's breach of contract and $306,993 in prejudgment interest.

DATED this 31st day of March, 2025.

BY THE COURT:

_Tena Campbell_
Tena Campbell
United States District Judge